603 S.E.2d 197

**Daniel R. STRAHIN, James A. Strahin, and Willa Strahin, Plaintiffs Below, Appellees**

v.

**Robert Glenn CLEAVENGER, Larry Cleavenger, Jr., and Mary Cleavenger, Defendants Below, Appellees**

and

**Earl Sullivan, Defendant and Third–Party Plaintiff Below, Appellant.**

**No. 31373.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 24, 2004.

Decided June 30, 2004.

Concurring Opinion of Justice Starcher July 2, 2004.

---

H. Gerald Kelley, Catherine A. McGuire, Kelley Legal Services, P.L.L.C., Philippi, for the Appellees.

James A. Varner, Tiffany R. Durst, Debra T. Hall Herron, McNeer, Highland, McMunn & Varner, Clarksburg, for the Appellant.

ALBRIGHT, Justice.

Through this appeal from the March 20, 2002, judgment order and the May 24, 2002, order denying post-trial motions of the Circuit Court of Barbour County, Earl Sullivan, defendant and third-party plaintiff below, appellant herein, challenges the jury verdict in a negligence action entered against him for the benefit of Appellee, Daniel Strahin, plaintiff below, appellee herein.[1] Appellant maintains that the lower court erred in the following ways: by finding a duty to protect present in the case and/or allowing the jury to determine the legal question of foreseeability in relation to the duty owed to Appellee; by finding that joint and several liability applies to situations in which both a negligent actor and an intentional actor bear responsibility for the injury incurred; by allowing the jury to award future damages for a permanent injury when no evidence was adduced at trial establishing the permanency to a reasonable degree of medical certainty; and by failing to grant a new trial on the basis of a clearly excessive verdict.

Having before us the petition for appeal, all matters of record and the briefs and argument of counsel, we affirm the order of

---

1. Hereinafter Earl Sullivan will be referred to as "Appellant" and Daniel Strahin will be referred to as "Appellee".

the lower court for the reasons set forth later in this opinion.

## II. Factual and Procedural Background

The civil action underlying this appeal arose from a criminal incident that occurred on May 31, 1998, outside a house being built by Appellant and Appellee's older sister, Marissa Strahin. On that day, Robert Cleavenger, armed with a high powered rifle, shot into Appellant's car where Appellant, Appellee and Marissa Strahin were seated, injuring both Appellant and Appellee. Robert Cleavenger pleaded guilty to two counts of malicious assault and served a sentence in the state penitentiary.

Based on the shooting incident, Appellee [2] filed a lawsuit in February 1999 against Robert Cleavenger, Mr. Cleavenger's parents, Mary and Larry Cleavenger, and Appellant.[3] Appellee's complaint alleged, among other things, that the injuries he sustained from the shooting were proximately caused by Appellant's negligence in light of the foreseeable conduct of Robert Cleavenger under the facts of the case.[4]

During the jury trial, which lasted from March 4 through March 7, 2002, evidence was presented about the strained relationship between Appellant and Robert Cleavenger. As one of the parties describes it, the rivalry between Appellant and Robert Cleavenger was the result of a love triangle involving Marissa Strahin. The record in this case reflects that beginning in high school and over several years, Marissa Strahin dated Appellant and Robert Cleavenger, albeit at what appears to be different times. As adduced from the testimony, the rivalry intensified for Robert Cleavenger when Marissa Strahin spent time with Appellant building a new house and working at Appellant's bar

which is located in an adjoining county.[5] Examples of how the rivalry manifested itself, as explained in testimony, included an episode one night where Robert Cleavenger drove his car directly at the car Marissa Strahin was driving and in which Appellant was a passenger, only to sharply turn away at the last minute. This incident of "chicken," which was not reported to the police, occurred during the same month that Robert Cleavenger shot at Appellant's car—the incident giving rise to the instant lawsuit.

The testimony was undisputed that on the day of the shooting, Marissa Strahin went to the house where Appellee was helping Appellant lay block when a neighbor arrived announcing that he discovered gun shell casings on his property. The discovery of shell casings was relevant to incidents of vandalism, involving damage from gun shots to a hot water tank and water lines, a propane tank, house windows and windshield and rear window of a vehicle, that had occurred at or near Appellant and Marissa Strahin's house for a month or so before the shooting at issue. Although no one was present at the house when the acts of vandalism occurred, Appellant found shell casings afterward. The various instances of property destruction were reported to the state police by Appellant.[6] According to the testimony of Appellant and Ms. Strahin, the officers responding to the calls were provided with the names of suspects, including Robert Cleavenger; however, the troopers testified that they were not given the actual name of any suspect.

Upon hearing about the shell casings, Appellant decided to drive over to the neighbor's property to look at them to see if they were the same type he had found near his house when the property was damaged.

---

2. Although not involved in this appeal, Appellee's parents were also named as plaintiffs in the negligence suit.

3. Appellee settled with Robert Cleavenger prior to trial; the jury found Robert Cleavenger's parents were not negligent.

4. Appellant also filed cross-claims against each of the Cleavengers as co-defendants; the lower court directed a verdict before trial in favor of Appellant against Robert Cleavenger on the cross-claim.

5. There was also testimony that the romantic relationship between Appellant and Marissa Strahin had ended several months before the shooting, and that Ms. Strahin was carrying Robert Cleavenger's child when the shooting occurred.

6. Two troopers testified during the trial concerning four different calls that were received about destruction of property at or near the house Marissa Strahin and Appellant were building.

Daniel and Marissa Strahin decided to join Appellant on the trip, with Daniel getting into the back seat of the car behind Appellant and Marissa taking the front passenger seat. At the same time, Robert Cleavenger was hiding in the woods watching the trio get into the car through the scope of a rifle. As the car began moving, Robert Cleavenger shot into the vehicle. A bullet entered the windshield, grazed Appellant's neck and shoulder and continued in its trajectory to strike Appellee in his upper arm. Appellant got out of the car and fired a gun in the direction of the shooter and, according to some testimony, at the same time called out Robert Cleavenger's name. Appellant then got Appellee out of the back seat of the car. Appellee testified at trial, orally and through demonstration, that the bullet wound severely and permanently injured his arm despite several corrective surgical procedures.

The jury returned a verdict for Appellee, apportioning thirty percent liability to Appellant based on negligence and seventy percent liability to Robert Cleavenger based on his intentional act. The lower court, through its judgment order, directed Appellant to pay the entire amount of the verdict based upon the doctrine of joint and several liability. Following the denial of his post-trial motions by the court below, Appellant petitioned this Court for appeal. The petition was granted by order of this Court dated and entered June 10, 2003.

## II. Standard of Review

Appellant asserts that the lower court erred by denying his motions for judgment as a matter of law, to alter or amend the judgment, and for a new trial. The standard of review for each of these circumstances is determined somewhat differently.

■ As we reaffirmed in syllabus point five of *Smith v. First Community Bancshares, Inc.,* 212 W.Va. 809, 575 S.E.2d 419 (2002): " 'The appellate standard of review for the granting of a motion for a [judgment as a matter of law] pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a [judgment as a matter of law]

when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a [judgment as a matter of law] will be reversed.' Syllabus Point 3, *Brannon v. Riffle,* 197 W.Va. 97, 475 S.E.2d 97 (1996)." Since this case involves the denial of such motion, the circuit court's ruling will be sustained unless only one reasonable and contrary conclusion can be made. We finally note that even though the challenge being raised is to rulings on motions made pre-verdict and post-verdict, our task proceeds along the same course because "[w]e apply a *de novo* standard of review to the grant or denial of a pre-verdict or post-verdict motion for judgment as a matter of law." *Gillingham v. Stephenson,* 209 W.Va. 741, 745, 551 S.E.2d 663, 667 (2001).

■ With regard to review of motions to alter or amend a judgment, our standard of review is dependent upon the nature of "the underlying judgment upon which the motion is based and from which the appeal ... is filed." Syl. Pt. 1, in part, *Wickland v. American Travellers Life Ins.,* 204 W.Va. 430, 513 S.E.2d 657 (1998). Hence, because the matter being contested is the legal issue of the lower court's application of the doctrine of joint and several liability, our review is de novo. *See* Syl. Pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996) ("conclusions of law are reviewed *de novo*").

■ Finally, "[w]e review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard ...[,] the circuit court's underlying factual findings under a clearly erroneous standard [and] [q]uestions of law ... [under] a *de novo*" standard. *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995). Put another way, "the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, in part, *Sanders*

*v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976).

### III. Discussion

#### A. Duty and Foreseeability

Appellant's challenge to various actions of the lower court centers on that court's determination that an owner or occupier of property has a duty to protect a visitor to the owner or occupier's property from the criminal activity of a third party. Appellant further claims that by allowing the matter to go to the jury, the lower court compounded its error by having the jury answer the legal question of whether a duty to protect existed.

#### 1. Preliminary Concepts

 Approaching and resolving the first issue raised in this appeal causes us to repair to fundamental concepts of negligence law, with close consideration to the element of duty of care. An action in negligence is ba ·d in tort law and is brought to recover damages from a party whose acts or omissions constitute the proximate cause of a claimant's injury. *Sewell v. Gregory,* 179 W.Va. 585, 587, 371 S.E.2d 82, 84 (1988). To prevail in a negligence suit, the plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff. *Webb v. Brown & Williamson Tobacco Co.,* 121 W.Va. 115, 118, 2 S.E.2d 898, 899 (1939). Consequently, the threshold question in all actions in negligence is whether a duty was owed. As succinctly stated in syllabus point one, in part, of *Parsley v. General Motors Acceptance Corporation,* 167 W.Va. 866, 280 S.E.2d 703 (1981), "No action for negligence will lie without a duty broken."

 We have previously described duty as a "question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk." *Robertson v. LeMaster,* 171 W.Va. 607, 611, 301 S.E.2d 563, 567 (1983), quoting W. Prosser, *The Law*

*of Torts,* § 53 (4th ed. 1971). Whether a person acts negligently is always determined by assessing whether or not the alleged negligent actor exercised reasonable care under the facts and circumstances of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances. Syl. Pt. 4, *Patton v. City of Grafton,* 116 W.Va. 311, 180 S.E. 267 (1935).

#### 2. Duty

 Unquestionably, courts bear the sole responsibility for deciding whether a legal duty is owed in a given case. We recognized in syllabus point five of *Aikens v. Debow,* 208 W.Va. 486, 541 S.E.2d 576 (2000), that "[t]he determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law."

 In the context of premises liability, we have said that the duty owed by "landowners or possessors [of property]... [to] any non-trespassing entrant [is] a duty of reasonable care under the circumstances." Syl. Pt. 4, in part, *Mallet v. Pickens,* 206 W.Va. 145, 522 S.E.2d 436 (1999). The present case has the further factual twist of the injury sustained by a non-trespassing visitor being the direct result of the intentional act of someone other than the owner or occupier of the property. Generally, owners or occupiers of land have no duty to protect visitors to their property from the deliberate criminal conduct of third parties "because the foreseeability of risk is slight, and because of the social and economic consequences of placing such a duty on a person." *Miller v. Whitworth,* 193 W.Va. 262, 266, 455 S.E.2d 821, 825 (1995). Nevertheless, in *Whitworth* we defined two instances where departure from the general rule is warranted.

 In *Whitworth* we were asked to determine whether a landlord owes a duty to protect a tenant from injury resulting from the criminal acts of a third party. After acknowledging the general proposition that there is no duty to protect against deliberate

criminal conduct of third parties, we went on to discuss the following recognized exceptions to this general rule:

> (1) when a person has a special relationship which gives rise to a duty to protect another person from intentional misconduct **or** (2) when the person's affirmative actions or omissions have exposed another to a foreseeable high risk of harm from the intentional misconduct. *Restatement (Second) of Torts* §§ 302B cmt. e and 315 (1965).

*Id.* (emphasis added). We proceeded in *Whitworth* to apply these two exceptions. Under the first exception we found that the relationship of landlord/tenant did not constitute a "special relationship."[7] Under the second exception, we concluded that "a duty will be imposed if a landlord's affirmative actions or omissions have unreasonably created or increased the risk of injury to the tenant from the criminal activity of a third party." *Id.* at 268, 455 S.E.2d at 827. Based on the facts in *Whitworth,* the prior unrelated incidents of some criminal activity occurring in the general vicinity of the leased property were not enough to impose a duty on the landlord in that case. Our holding in this regard in *Whitworth* was summarized in syllabus point six as follows:

> Under the common law of torts, a landlord does not have a duty to protect a tenant from the criminal activity of a third party. However, there are circumstances which may give rise to such a duty, and these circumstances will be determined by this Court on a case-by-case basis. A landlord's general knowledge of prior unrelated incidents of criminal activity occurring in the area is not alone sufficient to impose a duty on the landlord. However, a duty will be imposed if a landlord's affirmative actions or omissions have unreasonably created or increased the risk of injury to the tenant from the criminal activity of a third party.

193 W.Va. at 264, 455 S.E.2d at 823. Although our holding in *Whitworth* was de-

scriptively narrowed to landlords due to the facts then before this Court, it has equal application to any relevant premises liability case. *Cf. Scott v. Taco Bell Corp.,* 892 F.Supp. 142, 145 (S.D.W.Va.1995) (stating that under West Virginia law "there is no duty upon a person to protect another from the unforeseen criminal activity of a third party. This rule holds whether the person injured by the third party is a social guest, a tenant, an occupant, or a business invitee. An exception exists if the Defendant, by action or omission, unreasonably created or increased the risk of injury from the criminal activity of a third party."). Accordingly, we find no error in the lower court's determination that Appellant, as the owner or occupier of land in this case, owed a duty to protect non-trespassing visitors to his property from foreseeable high risk of harm. Our inquiry does not end here, however, since Appellant further argues that the lower court committed error by submitting the issue of foreseeability to the jury.

### 3. Foreseeability as a Component of Duty

▮▮▮▮ As we declared earlier in this opinion, duty is indeed a question of law for the court to decide. Duty is not, however, an inflexible principle since "[i]t is not absolute, but is always relative to some circumstance of time, place, manner, or person." Syl. Pt. 1, in part, *Dicken v. Liverpool Salt & Coal Co.,* 41 W.Va. 511, 23 S.E. 582 (1895). Moreover, we have found that:

> [t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Syl. Pt. 3, *Sewell v. Gregory,* 179 W.Va. 585, 371 S.E.2d 82 (1988). This test obviously involves a mix of legal and factual determinations which must be made regarding foreseeability in relation to duty in negligence

---

**7.** Allusion to a special relationship between Appellant and Appellee was made by reference to Appellee being a minor at the time of the incident. However, this alternative basis of liability announced in *Whitworth* was not fully developed either here or in the court below and we decline to decide this case on the basis of such relationship.

cases.[8] As this Court said over 100 years ago,

> the most the court can ordinarily do, when the question of care or negligence depends upon a variety of circumstances, is to define the decree (sic) of care and caution required by the law and leave to the practical judgment of the jury the work of comparing the acts and conduct of the parties with the duties required of them under the circumstances.

Syl. Pt. 2, in part, *Washington v. B. & O. R.R. Co.*, 17 W.Va. 190, 1880 WL 4038 (W.Va. 1880). Consequently, when the facts about foreseeability as an element of duty are disputed and reasonable persons may draw different conclusions from them, two questions arise—one of law for the judge and one of fact for the jury.

▪ Addressing the distinction between the roles of the court and jury when the facts about foreseeability are controverted, the Supreme Court of California explained that:

> [A] court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.
>
> The jury, by contrast, considers "foreseeability" ... [in] more focused, fact-specific settings.... [T]he jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place."

*Ballard v. Uribe*, 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 628–29 n. 6 (1986) (emphasis in the original). Thus, a court's overall purpose in its consideration of foreseeability in conjunction with the duty owed is to discern in general terms whether the type of conduct at issue is sufficiently likely to result

in the kind of harm experienced based on the evidence presented. If the court determines that disputed facts related to foreseeability, viewed in the light most favorable to the plaintiff, are sufficient to support foreseeability, resolution of the disputed facts is a jury question. The jury has the more specific job of considering the likelihood or foreseeability of the injury sustained under the particular facts of the case in order to decide whether the defendant was negligent in that his or her conduct fell within the scope of the duty defined by the court. " ' " ' "Questions of negligence ... present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Syl. Pt. 1, *Ratlief v. Yokum*, [167 W.Va. 779], 280 S.E.2d 584 (W.Va. 1981), *quoting* syl. Pt. 5, *Hatten v. Mason Realty Co.*, 148 W.Va. 380, 135 S.E.2d 236 (1964).' Syllabus Point 6, *McAllister v. Weirton Hosp. Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983)." Syl. Pt. 17, *Anderson v. Moulder*, 183 W.Va. 77, 394 S.E.2d 61 (1990).' Syl. Pt. 1, *Waugh v. Traxler*, 186 W.Va. 355, 412 S.E.2d 756 (1991)." Syl. Pt. 2, in part, *Johnson v. Mays*, 191 W.Va. 628, 447 S.E.2d 563 (1994); *see also* Syl. Pt. 3, in part, *Davis v. Sargent*, 138 W.Va. 861, 78 S.E.2d 217 (1953), Syl. Pt. 2, in part, *Evans v. Farmer*, 148 W.Va. 142, 133 S.E.2d 710 (1963).

▪ Essentially, the judge in cases such as the one before us has the responsibility of reviewing the evidence to see if it is sufficient for a jury to make a determination of whether or not it was foreseeable that the acts of the property owner or occupier could have under the facts of the case, disputed or not, created an unreasonable high risk of harm to the victim under the circumstances. When the facts are in dispute, the court identifies the existence of the duty conditioned upon the jury's possible evidentiary finding. Our review of the lower court's determination regarding the general finding of duty, as a matter of law, is reviewed de novo.

---

8. While our discussion is directed to the issue of foreseeability in the context of duty as raised by Appellant, foreseeability may also be relevant to the jury's determination of whether the negligence of the defendant in the case before it was a proximate cause of the injury of the plaintiff in that case. *See e.g.* 57A Am. Jur. 2d, Negligence § 469 (2004).

However, the lower court's assessment of the disputed evidence regarding conduct as a component of the identified duty is reviewed as a factual determination and will not be disturbed unless clearly wrong. Syl. Pt. 1, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996) ("Generally, findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*.")

We turn now to the relevant portions of the jury instruction given by the lower court in the present case to determine whether they are a fair representation of the law regarding duty. The lower court instructed:

In West Virginia no person owes a duty to protect another person from unforeseeable criminal conduct by a third party. In determining whether criminal conduct is foreseeable the test is: Would an ordinary person in the defendant's position, knowing what the defendant knew, or should have known, anticipate the harm of the general nature of that which was suffered was likely to result[?]

An act or omission may be negligent if a person realizes or should realize that the act or omission involves an unreasonable risk of harm to another even though the intentional conduct of the third party is criminal.

You are instructed that in certain situations a person, as a reasonable person, must anticipate and guard against the intentional or even criminal misconduct of others. Generally these situations arise where the person's own affirmative acts have created or exposed another to a recognizable high degree of risk or harm.

Definite rules as to when a person is required to take precautions against intentional or criminal misconduct cannot be stated. It is a matter of balancing the magnitude of the risks against a person's conduct. The factors that may be considered are known tendencies of an individual whose intentional conduct cause the harm, his or her known character, his or her known past conduct, the gravity of the harm which may result, together with the burden of the precautions which the person would be required to take.

\* \* \*

[I]f you find by a preponderance of the evidence that Earl Sullivan could foresee or reasonably should have foreseen the general nature of the criminal conduct by Robert Cleavenger on May 31, 1998, and that he was negligent by acting in some manner or failing to act in some manner, which was a proximate cause of the injuries to Daniel Strahin, then you may return a verdict in favor of Daniel Strahin against Earl Sullivan.

\* \* \*

If you find by a preponderance by the evidence that Earl Sullivan failed to reasonably cooperate with law enforcement personnel, then you may consider that in your deliberations.

 We find no error in the court's instruction in that it substantially applies the second exception announced in *Whitworth* by stating that the general circumstances in the case gave rise to a duty by Appellant as a premises owner or occupier if the jury found certain facts to be true. By electing to give this instruction, the lower court impliedly determined that the facts in the case were such that a jury could conclude that the conduct of Appellant as a property owner or occupier created an unreasonable high risk of harm to Appellee as a visitor to the property. Taking the facts most favorable to the plaintiff, we find no error in the judge's submission of this issue to the jury as the record contains sufficient facts from which a jury could find foreseeability. One plausible reading of the facts, viewed in the light most favorable to Appellee, includes that Appellant and Mr. Cleavenger were more than acquaintances: they had been good friends in grade school, remained friends through high school and maintained some relationship thereafter. Appellant knew of Mr. Cleavenger's tendency toward violence, especially when aroused by jealousy, as demonstrated by the story regarding Mr. Cleavenger's ex-wife. While the record relates various versions of the story Mr. Cleavenger told people in the community about being so angry with his first wife leaving him for another man that Mr. Cleavenger took initial steps to shoot the man, the violent nature of Mr. Cleavenger under these circumstances was related in all

renditions of the story. The record amply demonstrates that Appellant was also aware of Mr. Cleavenger's jealousy about the amount of time Appellant was spending with Ms. Strahin, who was working at the bar Appellant owned and lived in the same house as Appellant. A number of incidents were related through testimony about Mr. Cleavenger following the couple at various hours of the day and night and threatening Appellant, telling Appellant to leave Ms. Strahin alone, starting physical confrontations with Appellant, informing Appellant that he was angry that Ms. Strahin was pregnant with his child but spending time with Appellant and telling Appellant that he was upset that Ms. Strahin was working at Appellant's bar. There is also testimony that Appellant did not try to de-escalate argumentative situations with Mr. Cleavenger and instead provoked Mr. Cleavenger into physical fights. Appellant also knew that acts of vandalism were occurring on his property and that at least one law enforcement officer suggested that the damage caused by gunshots to the physical structure of the house, a vehicle and other personal property at the house without theft of any valuables on the premises gave the appearance that someone did not want anyone to live in the house. Even when the officer suggested that the damage looked like it was the type that an ex-lover would cause, Appellant chose not to give the officer Mr. Cleavenger's name as a possible suspect. The record also shows that Appellant obtained a gun permit during this time and began carrying a concealed weapon because he feared for his life. Despite his personal fear, Appellant nevertheless invited Appellee to his house to help lay block, which placed Appellee in jeopardy. When the shot came through the windshield of the car, Appellant immediately responded by calling out Mr. Cleavenger's name while returning fire.

In sum, our review does not reveal error in the legal or factual determinations of the lower court. The court identified the existence of a legal duty under the second exception of *Whitworth* and made the general determination that the relevant disputed facts were sufficient for a jury to determine whether or not it was foreseeable that the conduct of the property owner or occupier could have created an unreasonable risk of harm to the victim under the circumstances. The jury then was left with the responsibility of making the particularized determination of whether or not Appellant's conduct indeed fell within the scope of the legal duty identified by the court.

We establish no new duty in reaching our conclusions here as this case does not extend the law beyond that decided in *Whitworth*. Rather, the focal question presented and answered here is whether foreseeability as a component of duty was properly left to the jury. We pointedly stress that this case clearly does not place a duty on all owners or occupiers of premises to protect against every conceivable type of criminal activity on or around their property. Under the established standard in *Whitworth*, there has to be more than suspicion that someone may commit a crime at or on a person's property for the duty to arise. Nor does this opinion establish any type of heightened requirement to put visitors on notice of a vague possibility of danger when someone in a household has a quick temper. Enlarging the duty of premises owners and occupiers to this level would be beyond sound reasoning and common sense. Furthermore, the duty to protect against criminal activity does not boil down to whether or not a suspect was reported to the police by an owner or occupier of the property as Appellee suggests in his brief. The lower court's instruction in this regard did not abide by such a theory. This instruction simply informed the jury that they had to find that failure to reasonably cooperate with the police was proven by a preponderance of evidence before they could consider such failure in their deliberations. We once again emphasize that the duty announced in *Whitworth* is a narrow exception to the rule that property owners and occupiers are not liable for intentional criminal acts of others and we decidedly do nothing here to enlarge the scope of this duty.

### B. Joint and Several Liability

Appellant next argues that the lower court's misapprehension of the principle of joint and several liability resulted in the improper denial of Appellant's motion to alter or amend judgment. In this regard Appel-

lant contends that two defendants cannot be held jointly and severally liable for a plaintiff's injuries if one defendant commits an intentional act and the other a negligent act.

■ The parties agree it is clear that "[th]e basic purpose of the joint and several liability rule is to permit the injured plaintiff to select and collect the full amount of his damages against one or more joint tortfeasors." *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 707, 289 S.E.2d 679, 685 (1982). Appellant maintains, however, that our decisions in cases such as *Biro v. Fairmont General Hospital, Inc.,* 184 W.Va. 458, 400 S.E.2d 893 (1990), which relied on syllabus point four of *Butler v. Smith's Transfer Corporation,* 147 W.Va. 402, 128 S.E.2d 32 (1962), and *Kodym v. Frazier,* 186 W.Va. 221, 412 S.E.2d 219 (1991), limits the term joint tortfeasors to multiple defendants whose concurrent *negligence* has caused injury to the plaintiff. We simply cannot agree with such a myopic reading of these cases, especially since the cases did not involve a combination of intentional and negligent acts.[9] We find Appellee's direction to *Restatement (Third) of Torts* § 14 (1999) far more apposite to our deliberations considering the facts in the case before us. Said authority provides:

> A person who is liable to another based on a failure to protect the other from the specific risk of an intentional tort is jointly and severally liable for the share of comparative responsibility assigned to the intentional tortfeasor in addition to the share of comparative responsibility assigned to the person.

There following is the explanation that "[w]hen a person's unrelated tortious conduct and an intentional tortfeasor's acts concur to cause harm to another, the rules of joint and several liability ... govern." *Id.* at cmt. a. Moreover, the commentary explains that "in jurisdictions that retain full joint and several liability ..., the rule provided in this Section is unnecessary because joint and several liability applies to every tortfeasor who is a legal cause of the plaintiff's injury." *Restatement (Third) of Torts* § 14 cmt. b. West Virginia has not joined the various jurisdictions which have legislatively or judicially adopted comprehensive modification of the application of joint and several liability.[10] *See Restatement (Third) of Torts* § 17 cmt. a. at 151 (recognizing West Virginia as a pure joint and several liability jurisdiction and further observing that West Virginia Code § 29–12A–7(d) provides that in comparative fault cases joint and several liability is only limited to defendants assigned greater than twenty-five percent responsibility in actions against political subdivisions with pure joint and several liability applying in all other instances).[11] In speaking to the vitality of the joint and several liability doctrine and its aim of fully compensating an injured party, this Court has said that "[t]his jurisdiction is committed to the concept of joint and several liability among joint tortfeasors. A plaintiff may elect to sue any or all of those responsible for his injuries and collect his damages from who[m] ever is able to pay, irrespective of their percentage of fault." *Sitzes,* Syl. Pt. 2, in part. While we have not had occasion to globally define the term "joint tortfeasors," a tortfeasor or one who commits a tort has been consistently referred to by this Court as a wrongdoer. *See e.g. Woodrum v. Johnson,* 210 W.Va. 762, 781, 559 S.E.2d 908, 927 (2001); *Cook v. Stansell,* 186 W.Va. 189, 191, 411 S.E.2d 844, 846 (1991); *State ex rel. Bumgarner v. Sims,* 139 W.Va. 92, 112–113, 79 S.E.2d 277, 290 (1953); Syl. Pt. 5, *Parkersburg & Marietta Sand Co. v. Smith,* 76

---

**9.** The significance of the language in syllabus point four of *Butler v. Smith's Transfer Corporation, supra,* referred to as a definition of joint tortfeasor in *Biro v. Fairmont General Hospital, Inc., supra,* is limited to the facts then under discussion. In *Butler,* as in *Biro* and *Kodym v. Frazier, supra,* all of the wrongs committed by the joint tortfeasors were negligent acts.

**10.** *See* Christopher M. Brown, Kirk A. Morgan, *Comment: Consideration of Intentional Torts in Fault Allocation: Disarming the Duty to Protect against Intentional Conduct,* 2 Wyo. L. Rev. 483

(2002) (detailed and informative analysis of how and why various states attribute fault and liability in comparative fault cases).

**11.** The Legislature has subsequently limited liability in medical professional liability actions to "several, but not joint, liability against each defendant in accordance with the percentage of fault attributed to the defendant by the trier of fact." W.Va.Code § 55–7B–9(c) (2003) (Supp. 2003).

W.Va. 246, 85 S.E. 516 (1915); *Pegram v. Stortz*, 31 W.Va. 220, 236, 6 S.E. 485, 494 (1888). Likewise, *Black's Law Dictionary* defines joint tortfeasors by focusing on the wrongful or tortious conduct of the actors:

> [The] [t]erm [joint torfeasors] refers to two or more persons jointly or severally liable in tort for the same injury to person or property. Those persons who have acted in concert in their tortious conduct and are, accordingly, jointly and severally liable. Those who act together in committing wrong, or whose acts if independent of each other, unite in causing a single injury. (Internal citations omitted.)

*Black's Law Dictionary* 839 (6th ed., West 1990). We further note that this definition does not preclude application of joint and several liability on the basis of the intentional or negligent manner in which wrongful acts or omissions occur.

■ In order to remove any doubt there may be as to when joint and several liability attaches, we hold that tortfeasors whose wrongful acts or omissions, whether committed intentionally or negligently, concur to cause injury are joint tortfeasors who are jointly and severally liable for the damages which result from the wrongs so committed.[12] We find no error in the lower court's application of the law governing joint and several liability in this jurisdiction.[13]

### C. Proof of Permanency of Injury

In his third assigned error, Appellant argues that the lower court should have granted his motion for a new trial because there was no acceptable evidence presented at trial which supported the permanency of Appellee's injuries.[14] Appellant specifically maintains that the court below should not have submitted the issue to the jury because the evidence Appellee produced at trial about the permanency or future affect of his injury did not rise to what Appellant claims is the requisite standard of "a reasonable degree of medical certainty."

■ The key decision in this jurisdiction regarding proof of the permanency or future effect of an injury is *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974). This Court in *Bero* synthesized the various cases addressing the issue and determined that "the apparency of the injury to the beholder" was the critical factor as to the type of evidence that could be used to establish reasonable certainty of the permanency or future effect of an injury. *Id.* at 52, 210 S.E.2d at 635. Thereafter, we held in syllabus point eleven of *Bero* that:

> Where an injury is of such a character as to be obvious, the effects of which are reasonably common knowledge, it is competent to prove future damages either by lay testimony from the injured party or others who have viewed his injuries, or by expert testimony, or from both lay and expert testimony, so long as the proof adduced thereby is to a degree of reasonable certainty. But where the injury is obscure, that is, the effects of which are not readily ascertainable, demonstrable or subject of common knowledge, mere subjective testimony of the injured party or other lay witnesses does not provide sufficient proof; medical or other expert opinion testimony is required to establish the future

---

12. Appellant also proposed that our holding in syllabus point three of *Haynes v. City of Nitro*, 161 W.Va. 230, 240 S.E.2d 544 (1977), supports his position that joint and several liability arises when only negligent concurrent acts are proven. We find this reliance ill-placed. *Haynes* involved the issue of contribution among joint tortfeasors wherein we said "[i]n West Virginia one joint tort-feasor is entitled to contribution from another joint tort-feasor, except where the act is *malum in se.*" *Id.* at 230, 240 S.E.2d at 545. Clearly, *Haynes* relates to recovery among wrongdoers *subsequent* to apportionment of fault and liability. *See also* W.Va.Code §§ 55–7–12, –13.

13. Our decision in this case should not be construed to imply that punitive damages are a shared obligation when a joint tortfeasor's liability does not emanate from an intentional tort.

14. The March 20, 2002, order of the lower court reflects the award of: $60,556 for "[d]octor, hospital, and medical expenses to date;" $250,000 for "[p]hysical pain and suffering, mental and emotional distress, loss of enjoyment of life suffered to date;" $250,000 for "[a]ny and all future pain and suffering, mental anguish, emotional distress, inability to enjoy life;" and $500,000 for "[p]ermanent disability and disfigurement."

effects of an obscure injury to a degree of reasonable certainty.

█ In the case at bar, the extent and severity of the injuries to Appellee's arm were obvious as reflected in the following comment of the trial court: "Certainly in looking at his arm, it (the injury) is permanent. He's going to have that however long he's alive." The record shows that Appellee was called as a witness at trial and testified regarding his injury, which testimony included the removal of his shirt for demonstration of the mobility limitations of his left arm, wrist, hand and fingers resulting from the injury. Since Appellee's loss of full use of his left arm was an obvious injury, he was entitled to show the permanent effect of that injury through expert and/or lay testimony, including his own testimony, according to our holding in *Bero*. The record also shows that Appellee's representations were bolstered by the testimony of orthopedic surgeons, one of whom treated the injury to the bone of the affected arm and the other of whom performed tendon transfer surgery on the hand of that arm. Both doctors explained the extent of the damage to the arm caused by the bullet. Consequently, finding no misapprehension of the law or evidence regarding the issue of permanency, we affirm the lower court's ruling.

### D. Jury Verdict

█ Appellant's final argument is that the lower court abused its discretion in denying his motion for a new trial because the jury's verdict for Appellee was the product of passion and prejudice and was clearly excessive in light of the speculative evidence presented. The gravamen of Appellant's disagreement with the verdict in this case is that the intangible damages awarded Appellee exceeded special damages by a factor of seventeen. Our law is clear that "[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syllabus, *Addair v. Majestic Petroleum Co.*, 160 W.Va. 105, 232 S.E.2d 821 (1977). Given Appellee's young age and evidence of the

nature and extent of his injury, the continuing pain from the injury and the life expectancy of Appellant, we are unable to say that the jury's verdict is excessive or outrageous. Thus, we do not find that the lower court abused its discretion in denying a motion for a new trial on the ground of an excessive verdict.

### IV. Conclusion

For the reasons set forth, the March 20, 2002, and the May 24, 2002, orders and judgment of the Circuit Court of Barbour County in this case are affirmed.

Affirmed.

Chief Justice MAYNARD dissents and files a dissenting opinion.

Justice STARCHER concurs and files a concurring opinion.

MAYNARD, Chief Justice, dissenting.

In this case, the majority opinion upholds a jury award of $1,060,556.00 against Appellant Earl Sullivan despite the fact that Mr. Sullivan owed no duty to the victim, Daniel Strahin.

In *Miller v. Whitworth*, 193 W.Va. 262, 266, 455 S.E.2d 821, 825 (1995), this Court explained:

> Generally, a person does not have a duty to protect others from the deliberate criminal conduct of third parties. Some of the policy reasons for this rule ... include:
>> judicial reluctance to tamper with a traditional, common law concept; the notion that the deliberate criminal act of a third person is the intervening cause of harm to another; the difficulty that often exists in determining the foreseeability of criminal acts; the vagueness of the standard the owner [in a landlord/tenant relationship] must meet; the economic consequences of imposing such a duty; and conflict with the public policy that protecting citizens is the government's duty rather than a duty of the private sector.
>
> *Faheen by Hebron v. City Parking Corp.*, 734 S.W.2d 270, 272 (Mo.Ct.App.1987) (citation omitted). "Normally [a person] has

much less reason to anticipate intentional misconduct than he has to anticipate negligence. . . . This is true particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Restatement (Second) of Torts* § 302B cmt. d (1965). In other words, a person usually has no duty to protect others from the criminal activity of a third party because the foreseeability of risk is slight, and because of the social and economic consequences of placing such a duty on a person. (Citations omitted).

The Court in *Miller*, however, did recognize two exceptions to the general rule:

(1) when a person has a special relationship which gives rise to a duty to protect another person from intentional misconduct or (2) when the person's affirmative actions or omissions have exposed another to a foreseeable high risk of harm from the intentional misconduct. *Restatement (Second) of Torts* §§ 302B cmt. e and 315 (1965).

193 W.Va. at 266, 455 S.E.2d at 825. Mr. Sullivan did not have a special relationship to Strahin giving rise to a special duty. Therefore, Mr. Sullivan is not liable to Strahin unless his acts or omissions exposed Strahin to a foreseeable *high* risk of harm. I believe that there was no foreseeable high risk of harm in this case as a matter of law.

The majority opinion finds a foreseeable high risk of harm because of Mr. Cleavenger's *alleged* vandalism of Mr. Sullivan's uninhabited property; Mr. Cleavenger's involvement in a game of "chicken;" instances where Mr. Cleavenger initiated physical confrontations with Mr. Sullivan; and verbal threats. This reasoning expands the scope of foreseeability beyond all bounds of common sense, fairness, and public policy. As an example, under this rule, if I have had a conflict with another person that has erupted into a verbal or physical altercation, I am charged with presuming that person will commit a criminal and violent act against me. Therefore, I arguably commit negligence by permitting a third party simply to ride in my car or visit my property. This turns the traditional presumption that one will not violate the law into the presumption that one will violate the law and commit a violent crime given the slightest provocation. Apparently, we all should now fear that anyone with whom we have a strained relationship will come looking to gun us down.

In conclusion, the verdict in this case is fundamentally unfair, contrary to our well-established law on the foreseeability of criminal acts, and in contravention of our public policy against imposing duties on private citizens in complete disregard of the resulting social and economic consequences. Therefore, I strongly dissent.

STARCHER, Justice, concurring.

(Filed July 2, 2004)

While I agree with the majority regarding all issues addressed in the opinion, I write separately to respond to the implication raised by the dissent that we should have made findings of fact—and thereby intrude upon the province of the jury—in order to reach a contrary conclusion regarding foreseeability. Upon a thorough review of the record and in faithful adherence to the principles of law established nearly ten years ago in *Miller v. Whitworth*, 193 W.Va. 262, 455 S.E.2d 821 (1995), the majority determined only that the facts were such that a jury *could* find a high risk of harm was foreseeable. We cannot usurp the role of the jury nor substitute our judgment when we may differ with a fact-driven outcome. Moreover, the alarmist prognostications of the dissent are simply unfounded given the narrow exception which *Whitworth* established, as was cogently explained by the majority.