**OPINION**



IN THE

# Court of Appeals of Indiana

John Doe and Jane Doe,
as parents and legal guardians of Jill Doe, a minor,

*Appellants-Plaintiffs,*

v.

K.M.W. and K.J.W.,

*Appellees-Defendants.*



FILED
Feb 12 2024, 8:39 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

February 12, 2024

Court of Appeals Case No.
22A-CT-2922

Appeal from the
Johnson Superior Court

The Honorable
Marla K. Clark, Judge

Trial Court Cause No.
41D04-2012-CT-177

**Shepard, Senior Judge.**

# Statement of the Case[1]

K.M.W. and K.J.W., the mother and father respectively of K.D.W., a minor, hosted a party at their home during which Jill Doe, a minor child of John Doe and Jane Doe, was sexually molested by K.D.W. The Does filed a two-count complaint against K.M.W. and K.J.W. alleging premises liability and negligent parental supervision for the events leading up to and concluding with the sexual molestation of their daughter.

The trial court granted summary judgment in favor of K.M.W. and K.J.W., relying heavily on this Court's decision in *Wells v. Hickman*, 657 N.E.2d 172 (Ind. Ct. App. 1995), *trans. not sought*, and concluded that the Does were not entitled to relief as a matter of law under either theory of negligence.

The critical inquiry in today's case is whether this Court's duty analysis in *Wells v. Hickman*, a negligent parental supervision case, was implicitly overruled by a pair of Supreme Court decisions. *Rogers v. Martin*, 63 N.E.3d 316 (Ind. 2016)

---

[1] We held oral argument on July 12, 2023, in the Indiana Court of Appeals Courtroom. We would like to commend counsel for the quality of their presentations.

and *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E.3d 384 (Ind. 2016), clarified the foreseeability in the context of duty analysis in negligence cases, specifically in premises liability cases—which were subsequently clarified/modified by the Supreme Court in *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837 (Ind. 2020) and again most recently in *Pennington v. Memorial Hospital of South Bend, Inc.*, 223 N.E.3d 1086 (Ind. 2024). We conclude that the duty analysis used in *Wells* has not been implicitly overruled.

[4] Thus, we reverse and remand to the trial court on the theory of negligent parental supervision. However, as we explain below, our Supreme Court's decisions lead us to affirm the trial court's decision as to premises liability.

[5] We also address whether the court erred by striking portions of a medical expert's affidavit for purposes of its summary judgment decision. Concluding that those portions inappropriately express legal conclusions, we affirm the trial court's decision to strike them for purposes of summary judgment. We express no opinion about their admissibility in further proceedings.

[6] Therefore, we affirm on premises liability and reverse and remand on negligent parental supervision.

## Facts and Procedural History

### A. Background

[7] K.D.W. is not the biological son of K.M.W. and K.J.W. He was surrendered to the Department of Child Services by his biological mother in 2011. On May

29, 2013, when K.D.W. was eight years old, K.M.W. and K.J.W. began fostering him, and they adopted him on December 4, 2014. They were aware that K.D.W.'s biological mother was a prostitute and a drug addict and there had been incidents of domestic violence between K.D.W.'s biological parents. They also knew that K.D.W. was diagnosed with ADHD.

[8] K.M.W. arranged for K.D.W. to attend psychological therapy to address issues with anxiety, attention deficit disorder, and past trauma. Over time, the parents noticed that K.D.W. exhibited oppositional defiant behaviors such as lying, stealing, and arguing.

[9] On June 10, 2017, K.D.W.'s parents sent him to a summer camp at Purdue University. He was twelve. At Camp DASH he was housed on campus with other program participants whose ages ranged from eleven to fifteen. Late in the evening of June 20th, K.M.W. received a call that complaints had been made against K.D.W. and that his parents needed to pick him up immediately.

[10] K.D.W. was dismissed from Camp DASH and later charged by the Tippecanoe County Prosecutor with sexual battery after being accused of groping similarly-aged female participants over their clothes. The probable cause affidavit detailed K.D.W.'s unwanted groping or touching of female campers' thighs, buttocks, and breasts, along with aggressive hugging. Purdue University police officers interviewed K.D.W. in his parents' presence on August 8, 2017, and K.D.W. made several admissions about his alleged behavior.

[11]     K.M.W. arranged for K.D.W. to see his long-time therapist who had experience with sexual maladaptive behavior counseling and gave the therapist a copy of the probable cause affidavit. In the course of these therapy sessions, the parents learned that K.D.W.'s biological father had shown him pornography when he was younger. And K.J.W. noticed after the Camp DASH incident that K.D.W. had a preoccupation with sexual behaviors and was trying to access electronics more frequently than he had in the past. For example, K.D.W. accessed pornography on electronic devices and created a profile on a dating website where he represented himself as a twenty-five-year-old Romanian man.

[12]     K.D.W.'s therapist determined that he needed a safety plan. That safety plan recommended that K.D.W. not be alone with other children. During a deposition in this matter, K.M.W. acknowledged that the safety plan did not make a distinction between children and young children noting, "It was – just said children." *Id.* at 19. The therapist further recommended that the parents limit his access to electronic devices or supervise his access.

[13]     The parties dispute whether K.M.W. and K.J.W. informed other family members about the specific allegations and K.D.W.'s expulsion from Camp DASH. John Doe, who is K.M.W.'s brother, did not recall being told the substance of the allegations against K.D.W. He recalled generally that there were allegations resulting in his expulsion from Camp DASH. At best, the

Does recalled being informed that K.D.W. was expelled for a lack of supervision there and that K.D.W. should not be left alone with children. The Does claimed that K.J.W. and K.M.W.'s attitude toward K.D.W., however, remained unchanged.

[14] At the Tippecanoe County Prosecutor's request, K.D.W. underwent a psychosexual evaluation by Dr. Sean Samuels on May 14, 2018. K.D.W. was determined to be at low risk of engaging in the charged behavior toward younger children, similarly-aged peers, and older individuals. K.M.W. agreed during his deposition, however, that low risk did not mean no risk and the safety plan remained in place. Dr. Samuels recommended that K.D.W. see a therapist who specializes in sexual maladaptive behaviors.

[15] K.D.W. did receive specialized therapy for such behaviors beginning in July 2018 at Reach for Youth. K.M.W. expressed several concerns to the therapist in the initial joint session, including that: 1) K.D.W. will take flyers from the newspaper, as well as lingerie, and/or cheerleader magazines; and 2) she has found "naked barbie dolls in his room and hidden in various places in the house." *Id.* at 95.

## B. The Incident

[16] On August 26, 2018, K.M.W. and K.J.W. hosted a birthday party at their home. John, Jane, and Jill Doe were among the twenty-eight people there,

including other family members. K.D.W.'s safety plan remained in place at this time. K.M.W. and K.J.W. did not supervise K.D.W. because they were hosting the party and did not ask other adults to help supervise. Additionally, they did not tell the adults at the party about the allegations against K.D.W. for his behavior at Camp DASH.

[17] At the party, several cousins ranging in age from two to twenty-two, played games throughout the house. Some of the children, including K.D.W. and five-year-old Jill Doe went upstairs to play hide and seek and ping pong. Adults, including K.M.W., would go upstairs periodically to check on the children.

[18] According to the probable cause affidavit, on Monday, August 27, 2018, at approximately 8:00 p.m., John Doe received a text message from his sister, K.M.W., informing him that his daughter Jill Doe and K.D.W. were involved in an incident during the family gathering the day before. John Doe learned from K.M.W. and Jill Doe that during the game of hide and seek, when K.D.W. and Jill Doe were alone in his room, K.D.W. locked the door and pulled down his pants and Jill Doe's pants. Jill later told her father that K.D.W. instructed her to touch his penis, and when she said no, "grabbed her hand and made her touch it (penis)." *Id.* at 133. She said K.D.W. then "touched her on her vagina." *Id.*

[19] On Friday, August 31, 2018, Greenwood Police Department Detective Doug Wood conducted a Child's First Finding Words interview with Jill Doe.

During the interview, Jill Doe corroborated the information John Doe had learned from his sister. The officer spoke with John Doe on Thursday, September 13, 2018, confirming the fact that during the birthday party Jill Doe and her sister and K.D.W. were observed playing hide and seek. John Doe also informed the officer that Jill Doe disclosed the inappropriate touching to her sister, who then disclosed the incident when she went to school the next day. John further stated that he had received a call from his sister K.M.W. informing him of the incident.

[20] During K.D.W.'s interview with police officers, he verified he was playing hide and seek with Jill Doe at the party. However, K.D.W. explained that "his pants were partially down and [Jill Doe] had her hand, under his, on his penis for approximately 15 seconds." *Id.* at 134. He said he told Jill Doe that "if she didn't stop trying to touch him he would stop playing with her." *Id.* He then stated, "he had made a mistake and was accountable for his actions." *Id.* His parents acknowledged that K.D.W. was in treatment for his sexual maladaptive problems in part to prevent him from being a risk to others, and that it was their responsibility to arrange for that treatment.

[21] On September 19, 2018, probable cause was found to support a charge of child molesting, a Level 4 felony if committed by an adult, against K.D.W. Jill Doe has had to undergo mental health therapy because of the molestation.

## C. The Lawsuit

John and Jane Doe, as parents and legal guardians of Jill Doe, filed a complaint for damages against K.M.W. and K.J.W. asserting claims for both premises liability and negligent parental supervision. K.M.W. and K.J.W. filed a motion for summary judgment arguing they owed no duty to Jill under either theory. On July 22, 2022, the court granted the motion for summary judgment and also struck portions of the Does' medical expert affidavit. The Does now appeal.

# Discussion and Decision

## I. Negligence Claims

### A. Summary Judgment Standard of Review

When reviewing the grant of a motion for summary judgment, our standard of review is similar to that of the trial court. *Stabosz v. Friedman*, 199 N.E.3d 800, 807 (Ind. Ct. App. 2022), *trans. denied*. "Summary judgment is appropriate only where the moving party has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Id.* (quoting *Burris v. Bottoms Up Scuba-Indy, LLC*, 181 N.E.3d 998, 1003-04 (Ind. Ct. App. 2021)). "All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party." *Id.* (quoting *Burris*, 181 N.E.3d at 1004).

"We will not reweigh the evidence but will liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to

determine whether there is a genuine issue of material fact for trial." *Id.* (quoting *Perkins v. Fillio*, 119 N.E.3d 1106, 1110-11 (Ind. Ct. App. 2019)). "A trial court's grant of summary judgment is clothed with a presumption of validity." *Id.* And "[a] grant of summary judgment may be affirmed by any theory supported by the designated materials." *Id.*

## B. Analysis

### 1. Negligent Parental Supervision

[25] We begin by setting out the following passage from *Wells v. Hickman*:

> Parents are in a unique position in society because they have a special power to observe and control the conduct of their minor children. *See Prosser and Keeton on Torts* § 123 at 914-15 (5th ed. 1984). The power held by a parent is unlike that held by a child's teachers or peers because a parent has the ability to influence a child's behavior from birth and can observe and modify [his or] her child's actions. A parent, unlike a teacher, is in the best position to discover and act upon changes in [his or] her child's personality and behavior. Parents have a duty to exercise this power reasonably, especially when they have notice of a child's dangerous tendencies. That is not to say that a parent should be responsible for behavior that is not reasonably foreseeable, nor should a parent be held responsible for general incorrigibility or a nasty disposition.

657 N.E.2d 172, 178-79 (some citations omitted).

[26] The Does brought a claim of negligent parental supervision against K.D.W. and K.M.W. As a general rule, the common law does not hold parents liable for the tortious acts of their minor children. *Wells*, 657 N.E.2d at 176. But

there are four common-law exceptions to this general rule. *Id.* And the exception at issue here derives from Restatement (Second) of Torts, which reads:

> A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent
>
> (a) knows or has reason to know that he has the ability to control his child, and
>
> (b) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 316, at 123-24 (1965). Under this exception, foreseeability is an element of duty.[2] This exception is applicable "where the parent fails to exercise control over the minor child although the parent knows or with due care should know that injury to another is possible." *Wells,* 657 N.E.2d at 176 (quotation omitted).

---

[2] The Supreme Court came to this conclusion in *Rogers* and in *Pennington* under the language of Restatement (Second) of Torts, section 343. *See Rogers*, 63 N.E.3d at 324 (foreseeability component already explicit in the Restatement); *Pennington*, 223 N.E.3d at 1097 ("an unreasonable risk of harm" defendant "should realize" exists).

[27] This exception is known as the tort of "parental failure to control" or "negligent parental supervision." *Id.* at 177; *Shepard by Shepard v. Porter*, 679 N.E.2d 1383, 1389 (Ind. Ct. App. 1997), *reh'g denied*. Under this tort,

> a duty attaches when there has been a failure to control and the parent knows or should have known that injury to another was reasonably foreseeable. Specifically, the parent must know or should have known that the child had a habit of engaging in the particular act or course of conduct which led to the plaintiff's injury.

*Wells*, 657 N.E.2d at 178. The parent's negligence "is a separate act of negligence independent of the child's wrongful act." *Id.* at 177. Indiana adopted this exception in *Wells* and recognizes parental failure to control as a viable cause of action. *Id.*

[28] At issue here is whether the Supreme Court's decisions in *Goodwin*, *Rogers*, and *Cavanaugh's*, implicitly overrule the duty analysis in *Wells*. We conclude they do not. But prior to explaining why we reach that conclusion, we first demonstrate that even under the *Wells* analysis alone, the Does designated enough evidence to withstand the motion for summary judgment.

[29] In *Wells*, in the year preceding the behavior at issue, the child killed a pet dog and a pet hamster. *Id.* at 175. The child also expressed a desire to commit suicide, was often visibly angry, and once came home from school with a black eye, cuts, and bruises. On October 15, 1991, the child invited a twelve-year-old neighbor over to play video games at his house. Neither the child's mother nor his grandparents, with whom he lived, were aware that the two were together.

The boys did not play video games, however, and the child later informed his mother he thought he had killed his young neighbor. The neighbor's body was later found lying beside a fallen tree on the grandparents' property.

[30] Because *Wells* presented an issue of first impression, this Court turned to other jurisdictions which had adopted the failure to control exception and relied on *K.C. v. A.P.*, 577 So.2d 669 (Fla. App. 1991) for guidance. *K.C.* provided that a parent has a duty to exercise control over a minor child where "the parent knows or with due care should know that injury to another is *possible*." *Id.* at 671 (emphasis added). *K.C.* further provided that for a parent to be liable the parent must know that the child "had a habit of engaging in the particular act or course of conduct which led to the plaintiff's injury." *Id.* (quoting *Snow v. Nelson*, 475 So 2d 225, 2226 (Fla. 1985)). Under that analytical framework, we concluded that "[n]either the type of harm inflicted nor the victim in this case was foreseeable and, thus, cannot support the imposition of a duty upon [the mother]." *Wells*, 657 N.E.2d at 178.

[31] However, we rejected *K.C.*'s use of the term "possible" when analyzing parental liability under this exception, instead embracing that part of the analysis requiring the parent to have knowledge of the child's *habit* of engaging in the particular act or *course of conduct* which led to the injury. *Id.* at 178 n.3. Instead of using the "possibility analysis" we used the analysis from *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991), imposing a duty in negligence cases to "circumstances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." *Wells*, 657 N.E.2d at 178. We concluded that "a duty

attaches when there has been a failure to control and the parent knows or should have known that injury to another was reasonably foreseeable." *Id.* "Specifically, the parent must know or should have known that the child had a habit of engaging in the particular act or course of conduct which led to the plaintiff's injury." *Id.*

[32] In the present case, the trial court concluded that "the particular harm to Jill Doe was not foreseeable," in part because "K.D.W.'s actions at a camp that was away from home and with little supervision constitute[d] a single event" such that it was not a habit. Appellants' App. Conf. Vol. II, p. 30. The court further concluded that the "victim, Jill Doe, was also not foreseeable" because the "instance" of prior conduct at Camp DASH "occurred exclusively with other females near K.D.W.'s age" and "took place outside the home with little supervision." *Id.* at 31. We disagree.

[33] The probable cause affidavit, which is part of the designated materials, detailed unwanted groping or touching by K.D.W. of several different female campers' thighs, buttocks, and breasts, along with aggressive hugging. Appellants' App. Conf. Vol. III, pp. 76-77. And Petition Alleging Delinquency set out that "[b]etween June 10, 2017 and June 21, 2017, [K.D.W.] did touch FD, BL, DL, DS and/or AT with the intent to arouse or satisfy the sexual desires of [K.D.W.] . . . ." Appellants' App. Conf. Vol. II, p. 71. D.L. reported that at Camp DASH, K.D.W. engaged in "unwanted aggressive hugging" with her "that necessitated physical force to get free." Appellants' App. Conf. Vol. III, p. 76. D.S. was interviewed and told law enforcement that K.D.W. placed his

arm around her lower waist along with other unwanted touching "approximately 40 times" while at Camp DASH and that she had "observed him touch other camper's [sic] upper thighs and buttocks." *Id.* A.T. told law enforcement that K.D.W. "touched both her buttocks and breasts" in the laundry room at Camp DASH. *Id.* In sum, this was more than a single incident.

[34]  K.D.W.'s behavior not only suggests a habit of engaging in unwanted touching in a sexual manner, but also a course of conduct of unwanted touching of females especially while unsupervised. Moreover, the record shows that K.D.W.'s parents were aware of his behavior at Camp DASH. Thus, regardless of the impact of the decisions in *Goodwin*, *Rogers*, *Cavanaugh's*, and *Pennington*, under the *Wells* analysis, Jill Doe was a foreseeable victim of a foreseeable harm.

[35]  Next, we examine whether subsequent cases issued by our Supreme Court – which helped shape the foreseeability in the context of duty analysis – have impact on our conclusion that Jill Doe was a foreseeable victim of a foreseeable harm, a conclusion we reached under the *Wells* analysis.

[36]  After *Wells* was decided, our Supreme Court issued a series of decisions which helped shape foreseeability in the context of duty analysis. Although the analysis was developed through premises liability cases, the Supreme Court has not expressly limited the analysis to such cases. Setting out the evolution of the analysis, the *Rogers* Court explained that in prior cases, appellate courts used the

three-part balancing test announced in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991). The plaintiff in *Webb* urged the Court "to find an affirmative duty on the part of a physician to administer medical treatment to a patient in such a way so as to take into account possible harm to unidentifiable third persons." *Id.* at 995. In other words, the Court was asked to determine whether a cognizable cause of action imposing a duty existed. The *Webb* Court articulated the three-factor balancing test used to determine the existence of a duty, which includes examining the: (1) relationship between the parties; (2) foreseeability of harm; and (3) public policy concerns. *Id.* at 997.

[37] The *Rogers* Court noted that in subsequent cases involving premises liability due to activities on the land, such as *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 971 (Ind. 1991), it had found the *Webb* balancing test unnecessary. 63 N.E.3d at 323-24. In other words, because the duty to exercise reasonable care had already been determined, "courts must look at one critical element before extending that duty to cases where an invitee's injury occurs . . . due to some harmful activity on the premises. That element is foreseeability." *Id.* at 324.

[38] Next, the *Rogers* Court announced "how the foreseeability analysis is actually performed" with respect to duty and set out its "definitive path" as follows:

> When foreseeability is part of the duty analysis, as in landowner-invitee cases, it is evaluated in a different manner than foreseeability in the context of proximate cause. Specifically, in the duty arena, foreseeability is a general threshold determination that involves an evaluation of (1) the broad type of plaintiff and (2) the broad type of harm. In other words, this foreseeability

analysis should focus on the general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected—without addressing the specific facts of the occurrence. We believe this analysis comports with the idea that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.

63 N.E.3d at 324-25 (internal citations and quotations omitted).

[39] And in *Goodwin*, decided the same day as *Rogers*, the Supreme Court observed that prior appellate decisions had reshaped the *Webb* balancing test into a consideration of the "totality of the circumstances," "looking to all of the circumstances surrounding an event, including the nature, condition, and location of the land, as well as prior similar incidents." 62 N.E.3d at 387 (internal quotations omitted). The Court further observed that in *Northern Indiana Public Service Co. v. Sharp*, 790 N.E.2d 462 (Ind. 2003), it had found the *Webb* balancing test "a useful tool in determining whether a duty exists . . . only in those instances where the element of duty has not already been declared or otherwise articulated." 62 N.E.2d at 387 (internal quotations omitted). Ultimately, the Court in *Goodwin* "recognize[d] that although the 'totality of the circumstances' test is useful in determining foreseeability in the context of proximate causation, it is inappropriate when analyzing foreseeability in the context of duty." *Id.* at 389.

[40] Like the *Rogers* decision, the *Goodwin* decision explained the path courts are to take going forward when analyzing foreseeability as a component of duty. The Court expressly rejected the *Webb* analysis and that of its own decision in *Estate*

*of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265 (Ind. 2003), in favor of the analysis

set out in this Court's prior decision in *Goldsberry v. Grubbs*, 672 N.E.2d 475

(Ind. Ct. App. 1996). The *Goldsberry* analysis adopted in *Goodwin* follows:

> [T]he foreseeability component of the duty analysis must be something different than the foreseeability component of proximate cause. More precisely, it must be a lesser inquiry; if it was the same or a higher inquiry it would eviscerate the proximate cause element of negligence altogether. If one were required to meet the same or a higher burden of proving foreseeability with respect to duty, then it would be unnecessary to prove foreseeability a second time with respect to proximate cause. Additionally, proximate cause is normally a factual question for the jury, while duty is usually a legal question for the court. As a result, the foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence, while the foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.

*Goodwin*, 62 N.E.3d at 390 (quoting *Goldsberry*, 672 N.E.2d at 479). And the

rationale behind the analysis is as follows:

> [A] court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" . . . [in] more focused, fact-specific settings. . . .

*Id.* at 391 (quoting *Strahin v. Cleavenger*, 216 W.Va. 175, 603 S.E.2d 197, 207 (2004)).

[41] Next, in *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, a majority of the Supreme Court added that,

> [w]hen evaluating the broad class of plaintiff and broad type of harm in these cases, we acknowledge a key factor is whether the landowners knew or had reason to know about any present and specific circumstances that would cause a reasonable person to recognize the probability or likelihood of imminent harm. *See Goodwin*, 62 N.E.3d at 385 (noting that, just before the barroom shooting, all the parties were separately "socializing" at "the small establishment"); *Rogers*, 63 N.E.3d at 319 (remarking that the homeowner observed that her co-host was, before attacking a house-party guest, "just 'being normal,' and it was not obvious to her that he had 'a buzz going'" from drinking alcohol); *id.* (observing that, before the guest was found dead outside her home, the homeowner saw him "lying motionless on the basement floor with his eyes closed"). If landowners had reason to know of any imminent harm, that harm was, as a matter of law, foreseeable in the duty context. *See, e.g.*, *id.* at 327 (holding that it was foreseeable "that a house-party guest who is injured on the premises could suffer from an exacerbation of those injuries").

140 N.E.3d 837, 840-41 (Ind. 2020).

[42] Thus, although the Supreme Court in *Goodwin* and *Rogers* spoke about foreseeability in terms of a broad type of plaintiff and a broad type of harm, both decisions involved an analysis of the contemporaneous knowledge of the landowner of the probability or likelihood of imminent harm—which by

necessity involves addressing the specific facts of the occurrence to a certain extent. *See Singh v. Singh*, 155 N.E.3d 1197, 1208 (Ind. Ct. App. 2020) ("Accordingly, it appears that, in practice, an examination of particular facts is necessary to fully resolve the question of duty at this stage and to properly apply *Cavanaugh's* required 'foreseeability as a component of duty' analysis.").

[43] In *Cavanaugh's*, the Supreme Court noted that several decisions of this Court, post-*Goodwin* and *Rogers*, had similarly evaluated foreseeability in the context of duty and found duty existed based on the contemporaneous knowledge of the defendant. *See Hamilton v. Steak 'n Shake Operations, Inc.*, 92 N.E.3d 1166 (Ind. Ct. App. 2018), *trans. denied*; *Certa v. Steak 'n Shake Operations Inc.*, 102 N.E.3d 336 (Ind. Ct. App. 2018), *trans. denied*; and *Buddy & Pals III, Inc. v. Falaschetti*, 118 N.E.3d 38 (Ind. Ct. App. 2019), *trans. denied*; *see also Doe v. Delta Tau Delta Beta Alpha Chapter*, No. 1:16-cv-1480, 2018 WL 3375016 (S.D. Ind. July 11, 2018).

[44] In *Pennington*, our Supreme Court clarified that in premises cases, in the context of duty, there are different foreseeability analyses depending on whether the claim is based on the condition of the premises or the harmful activities occurring thereon. 223 N.E.3d at 1097. Therefore, it is logical that in a negligence case, alleging negligent parental supervision, a different foreseeability analysis, such as that announced in *Wells*, would apply. Moreover, premises liability cases begin by presuming that a landowner owes a duty of care to invitees. *See Burrell v. Meads*, 569 N.E.2d 637, 639 (Ind. 1991) ("[A] landowner owes the highest duty to an invitee: a duty to exercise

reasonable care for his protection while he is on the landowner's premises."). But in cases involving parents and the torts of their children, we begin with the presumption that the parent owes no duty. *See Wells*, 657 N.E.2d at 176 ("As a general rule, the common law does not hold a parent liable for the tortious acts of her minor children.").

[45] Thus, when an exception such as negligent parental supervision is alleged, we turn not to the *Webb* analysis—(1) relationship between the parties; (2) foreseeability of harm; and (3) public policy concerns—but to the foreseeability in the context of duty analysis, first developed by *Wells*, and shaped by the subsequent cases of our Supreme Court. A more stringent foreseeability in the context of duty analysis, like the one announced in *Wells*, is required in order to preserve the general rule of non-liability of parents for the torts of their children.

[46] Consequently, for the exception to apply and the claim to move forward, "the parent must know or should have known that the child had a habit of engaging in the particular act or course of conduct which led to the plaintiff's injury." *Wells*, 657 N.E.2d at 178. And we observe that there are two parts to this analysis: whether there is evidence that the parent knew or should have known that the child (1) had a habit of engaging in the particular act, or (2) had a habit of engaging in the course of conduct.

[47] Turning to the facts of this case, we conclude that K.M.W. and K.J.W. owed a duty to Jill Doe. They were aware of K.D.W.'s difficulties at home and his behavior at Camp DASH. They were aware of the need for K.D.W.'s safety

plan. And they were also aware of his sexual maladaptive behavior at home. Whether they breached that duty or acted reasonably under the circumstances are questions for a jury. However, as for the foreseeability in the context of duty analysis, based on what they knew prior to the incident, Jill Doe was a foreseeable victim of a foreseeable harm because K.M.W. and K.J.W. knew or should have known that K.D.W. had a habit of engaging in the conduct that resulted in Jill Doe's injuries.

[48] For all the reasons explained above, we conclude that the trial court erred by granting summary judgment in favor of K.J.W. and K.M.W. on this count of the Does' complaint.

## 2. Premises Liability

[49] The Does' negligence claim requires them to establish that (1) K.M.W. and K.J.W. owed a duty to Jill Doe; (2) they breached that duty by allowing their conduct to fall below the applicable standard of care; and (3) their breach of duty proximately caused a compensable injury to Jill Doe. *Rogers*, 63 N.E.3d at 321. The Does allege that K.M.W. and K.J.W. owed a duty to protect Jill Doe from harm because she was a social guest upon their premises.

[50] "Under Indiana premises liability law, the duty a landowner owes to an invitee is well established: a landowner must exercise reasonable care for the invitee's protection while the invitee is on the premises." *Id.* at 320. "Because this general duty has been articulated, the Court need not judicially determine the existence of a separate duty today." *Id.* "Rather, we look to foreseeability as

the critical inquiry in deciding whether the landowner-invitee 'duty to protect' extends to a particular scenario." *Id.* And "[i]t is well settled that absent a duty, there can be no breach." *Id.* at 321.

[51] Reasonable care requires

> a person to anticipate and guard against what usually happens or is likely to happen and that a failure to do this is negligence; but that reasonable care does not require him to foresee and guard against that which is unusual and not likely to occur, and a failure to do this is not negligence.

*Vetor by Weesner v. Vetor*, 634 N.E.2d 513, 517 (Ind. Ct. App. 1994) (quoting *Alfano v. Stutsman*, 471 N.E.2d 1143, 1145 (Ind. Ct. App. 1984)). "Over the years, the application of this broadly stated landowner-invitee duty to particular situations has depended on one critical element: foreseeability." *Rogers*, 63 N.E.3d at 321.

[52] In *Rogers*, the Court recognized that "[w]hen a physical injury occurs as a result of a condition on the land, the three elements described in Restatement (Second) of Torts section 343[3] accurately describe the landowner-invitee duty."

---

[3] Restatement (Second) of Torts section 343 provides:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Id.* at 322-23. And "while section 343 limits the scope of landowner-invitee duty in cases involving injuries due to *conditions of* the land, injuries could also befall invitees due to *activities on* a landowner's premises unrelated to the premises' condition—and that landowners owe their invitees the general duty of reasonable care under those circumstances, too." *Id.* at 323.

[53] And when there was no "notice of present and specific circumstances that would cause a reasonable person to recognize the risk of an imminent criminal act, [this Court] has consistently held since *Goodwin* and *Rogers* . . . that landowners cannot foresee these sudden attacks." *Cavanaugh's*, 140 N.E.3d at 842-43. *See Powell v. Stuber*, 89 N.E.3d 430 (Ind. Ct. App. 2017), *trans denied*; *Jones v. Wilson,* 81 N.E.3d 688 (Ind. Ct. App. 2017)*, trans. not sought*; *Cosgray v. French Lick Resort & Casino*, 102 N.E.3d 895 (Ind. Ct. App. 2018), *trans not sought*; and *Rose v. Martin's Super Markets L.L.C.*, 120 N.E.3d 234 (Ind. Ct. App. 2019), *trans. denied*.

[54] Our Supreme Court recently addressed the foreseeability analysis in *Pennington*. In that case, Jennifer Pennington, a patron of a health and fitness center, was injured while swimming in the center's swimming pool. 223 N.E.3d at 1092. While transitioning between different swimming strokes, "her head collided with the corner of the wing-wall by the entry steps, causing her injury." *Id.* Pennington and her husband filed a complaint alleging various theories of negligence as the cause of her injuries.

[55] Our Supreme Court said,

In cases involving conditions on the land or premises, section 343's foreseeability analysis focuses specifically on "the condition" that allegedly resulted in injury. *See* Restatement (Second) of Torts § 343. In *Griffin v. Menard, Inc.*, for example, the plaintiff was injured when a sink fell onto him out of a cardboard box. 175 N.E.3d 811, 812 (Ind. 2021). We focused on whether Menard had any "actual or constructive knowledge that **the box** was defective." *Id.* at 814 (emphasis added).

A different test applies in cases stemming from "*activities* on a landowner's premises unrelated to the premises' condition." *See Rogers*, 63 N.E.3d at 323. In the companion cases of *Rogers* and *Goodwin*, we explained that, "in the duty arena," foreseeability "involves an evaluation of (1) the broad type of plaintiff and (2) the broad type of harm." *Id.* at 325; *see Goodwin*, 62 N.E.3d at 394 (restating the same). We consider the "general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected—**without addressing the specific facts of the occurrence.**" *Rogers*, 63 N.E.3d at 325 (citing *Goodwin*, 62 N.E.3d at 388-89) (emphasis added). In *Goodwin*, for example, the plaintiffs alleged that the defendant bar should have protected them against being shot by a patron. 62 N.E.3d at 385-86. We asked the general question whether "bar owners routinely contemplate that one bar patron might suddenly shoot another." *Id.* at 393-94.

A critical difference thus exists between the foreseeability tests for conditions and activities. The Restatement test that we use for conditions looks at whether the danger posed by the specific condition involved was foreseeable. Whereas, the *Rogers/Goodwin* test that we use for activities looks at whether it was foreseeable that a general class of persons to which the plaintiff belonged might suffer the general type of harm involved. This distinction makes sense in that a landowner can know the precise physical condition of their premises, but only generally foresee what conduct or behavior will occur. In today's case, it

> potentially makes a significant difference whether courts will consider the general foreseeability of a swimmer hitting a wall or the specific risk of injury posed by the particular wing-wall involved.

*Id.* at 1097-98. The Court concluded that the appropriate foreseeability analysis followed Restatement section 343, and used the test for the foreseeability of dangerous conditions. *Id*. at 1098. The Court concluded that genuine issues of material fact existed such that granting summary judgment for the center was erroneous. *Id.* at 1100. Therefore, the foreseeability analysis for premises claims arising from harmful activities has been clearly articulated.

[56] Here, the trial court concluded that "[a] duty of reasonable care requires a person to anticipate and guard against what usually happens or is likely to happen, and a failure to do so is negligence." Appellants' App. Vol. II, p. 32. The court also concluded that: (1) "[b]ecause K.D.W.'s molestation of Jill Doe was not likely to occur, the Defendants were not negligent; and (2) "the presence of a troubled child is not equivalent to a dangerous condition or activity on the premises." *Id.* The court granted summary judgment as a matter of law in favor of K.M.W. and K.J.W.

[57] In today's case, using the Supreme Court's analysis for premises claims involving harmful activities on the land, the broad type of plaintiff is a female child attending a family gathering. And the broad type of harm is sexual molestation of that child by another child attending the family gathering. Using the *Goodwin* query, which was embraced in *Pennington*, the general question we

ask is whether hosts of family gatherings routinely contemplate that one family member/guest might sexually molest another. *See Goodwin*, 62 N.E.2d. at 393-94; *Pennington*, 223 N.E.3d at 1097. We conclude that they do not and affirm the trial court's decision to grant summary judgment in favor of K.M.W. and K.J.W. on the premises liability claim of the Does' complaint.

## II.  Evidentiary Ruling

[58]  Finally, we address whether the trial court correctly struck portions of the affidavit of Dr. Julie Medlin for purposes of its summary judgment order.

### A.  Standard of Review

[59]  "We review for an abuse of discretion a trial court's decision on a motion to strike." *Halterman v. Adams Cnty Bd. Of Comm'rs*, 991 N.E.2d 987, 989 (Ind. Ct. App. 2013). And we "will reverse only when the decision is clearly against the logic and effect of the facts and circumstances." *Id.*

### B.  Analysis

[60]  The Does argue that the trial court erroneously excluded the following paragraphs from the affidavit of expert witness Dr. Julie Medlin:

> 10.    As I will explain in this affidavit, it is my opinion that [K.M.W.] and [K.J.W.] knew or should have known that in August 2018, their son, [K.D.W.] was at risk for engaging in sexual abusive behaviors, including the inappropriate touching and sexual abuse of a young child like [Jill Doe], if not properly supervised by his parents.

. . . .

16.    It is my opinion that [K.J.W.] and [K.M.W.] knew or should have known that failure to follow the safety plan would result in [K.D.W.] engaging in sexual maladaptive behaviors, including but not limited to the inappropriate touching or sexual molestation of a younger child like [Jill Doe].

17.    It is my opinion that on the day of [the] incident that is the subject of the above captioned cause, [K.J.W.] and [K.M.W.]'s failure to adequately supervise [K.D.W.] made it foreseeable that [K.D.W.] would engage in sexual maladaptive behaviors including but not limited to the inappropriate touching or sexual molestation of a younger child like [Jill Doe].

Appellants' App. Conf. Vol. 2, pp. 130, 132-33. The trial court concluded that the language used in those paragraphs tracked the Restatement's language used to determine the existence of a duty in claims alleging negligent parental supervision. We agree.

[61] Indiana Rule of Evidence 702 provides for the admissibility of expert opinions. The Rule provides:

Ind. Evidence Rule 702.

(a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

(b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

[62] "In addition to asserting admissible facts upon which the opinion is based, an expert opinion affidavit must also state the reasoning or methodologies upon which it is based." *Thayer v. Vaughn*, 798 N.E.2d 249, 254 (Ind. Ct. App. 2003), *trans. denied*. "The trial court must be provided with enough information to proceed with a reasonable amount of confidence that the principles used to form the opinion are reliable." *Id.*

[63] The parties do not dispute Dr. Medlin's qualifications as an expert. The question here is whether Dr. Medlin's affidavit includes opinions concerning legal conclusions. Evidence Rule 704 provides as follows:

(a) In General--Not Automatically Objectionable. Testimony in the form of an opinion or inference otherwise admissible is not objectionable just because it embraces an ultimate issue.

(b) Exception. *Witnesses may not testify to opinions concerning* intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or *legal conclusions.*

(emphasis added).

[64] "[E]xperts should not be permitted to offer legal conclusions as part of their testimony because to do so would violate the spirit of Evidence Rule 704(b), which provides that '[w]itnesses may not testify to opinions concerning . . .

legal conclusions.'" *Kelly v. Levandoski*, 825 N.E.2d 850, 864 (Ind. Ct. App. 2005) (quoting *Vaughn v. Daniels Co. (West Virginia), Inc.*, 777 N.E.2d 1110, 1122-123 (Ind. Ct. App. 2002) (overruled by *Vaughn v. Daniels Co. (West Virginia), Ind.*, 841 N.E.2d 1133, 1137 (Ind. 2006)) ("His opinions concerning reasonable care or proximate cause in paragraph 17 embrace ultimate issues to be decided by the trier of fact and therefore are admissible."), *trans. denied*. "The purpose of the rule is that legal conclusions from a witness are not helpful to the trier of fact; the judge, not an expert witness, instructs on the law." *Id.* In today's case, the statements contained in affidavit paragraphs numbered 10, 16, and 17 pertain to the legal conclusion the court should make about foreseeability in the context of duty. The statements here violate the evidentiary rules, particularly Rule 704(b), because they offer legal conclusions not to be decided by the trier of fact, but by the trial court, and were properly stricken.

[65] We affirm the trial court's decision to strike those statements for purposes of its summary judgment determination. However, we offer no opinion as to the admissibility of the affidavit or any portions thereof in further proceedings.

## Conclusion

[66] In light of the foregoing, we affirm the trial court's grant of summary judgment on the premises liability claim. We also affirm the court's decision to strike portions of the expert's affidavit. However, we reverse the court's grant of

summary judgment on the negligent parental supervision claim and remand the matter to the trial court for further proceedings on the merits.

[67] Affirmed in part, and reversed and remanded in part.

Riley, J., and Tavitas, J., concur.

ATTORNEYS FOR APPELLANTS
Amy M. Davis
Law Office of Amy M. Davis
Indianapolis, Indiana

Katherine A. Franke
Broadwing Legal
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA TRIAL LAWYERS ASSOCIATION

Todd C. Barnes
DOBS & Farinas, LLP

ATTORNEYS FOR APPELLEES
Dina M. Cox
Anthony J. Simonton, Jr.
J. Neal Bowling
Lewis Wagner, LLP
Indianapolis, Indiana