


FILED

Jun 09 2025, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Simon Property Group, L.P., a/k/a Simon Property Group, Inc., and Universal Protection Service, LLC, d/b/a Allied Universal Security Services, LLC,

*Appellants-Defendants*

v.

Kaya P.R. Stewart, Eumeka R. Stewart, and Samuel Stewart III in their Individual Capacities, and Eumeka R. Stewart and Samuel Stewart III, as Parents and Legal Guardians of O.S., a Minor,

*Appellees-Plaintiffs*

June 9, 2025

Court of Appeals Case No.
24A-CT-1700

Appeal from the Marion Superior Court

The Honorable Christina R. Klineman, Judge

**Opinion by Judge Brown**
Chief Judge Altice and Judge Tavitas concur.

**Brown, Judge.**

[1] This case involves a mass shooting that occurred at the Greenwood Park Mall (the "Mall") on July 17, 2022. Simon Property Group, L.P., a/k/a Simon Property Group, Inc., ("Simon") owned and operated the Mall. Simon and Universal Protection Service, LLC, ("Universal," and together with Simon, "Defendants") appeal the trial court's order denying their motions to dismiss the complaint filed by Kaya P.R. Stewart, Eumeka R. Stewart, and Samuel Stewart III in their Individual Capacities, and Eumeka R. Stewart and Samuel Stewart II, as Parents and Legal Guardians of O.S. (collectively, "Plaintiffs"). We affirm.[1]

## Facts and Procedural History

[2] The well-pleaded facts of the Plaintiffs' January 30, 2024 Amended Complaint for Damages indicated that Jonathan Sapirman walked from his nearby residence, through the parking lot of the Mall, past multiple security patrols and video cameras, and entered the Mall at approximately 4:54 p.m. on July 17,

---

[1] On April 23, 2025, we held oral argument. We thank counsel for their well-prepared advocacy.

2022. During his walk, Sapirman wore or carried "a long, black backpack consistent with those used to tote rifles and other assault weapons." Appellants' Appendix Volume II at 40. After entering the Mall, Sapirman entered the food court area and the men's restroom in a vestibule adjacent to the food court. He spent more than an hour inside a stall of the restroom during which he donned an ammunition vest and assembled several weapons, including a Sig Sauer model 400M rifle, a Smith and Wesson M&P15 rifle, and a Glock model 33 handgun, with which he intended to carry out a mass shooting. He attempted to flush his cell phone down the toilet.

[3] At 5:56 p.m., Sapirman exited the restroom carrying the loaded Sig Sauer rifle in his hands and shot and killed "an adult Hispanic male outside the restroom." *Id.* He then "held the rifle at or above his shoulder level and fired dozens of shots over the heads of nearby White patrons and down toward clusters of Black and Hispanic individuals in the food court." *Id.* "Two Hispanic adults – a married couple – were killed, and several others were injured, including Plaintiff Kaya Stewart, who was seated at a nearby table." *Id.* at 40-41. Sapirman shot directly at O.S. "as she first approached the table, observed that her sister had been shot, then turned and ran in terror." *Id.* at 41. "The bullets missed O.S. but struck several items she was carrying in her hands." *Id.*

[4] Eumeka was walking toward the food court to meet her daughters, Kaya and O.S., when she heard shots and screaming and smelled gunpowder. She faced a crowd of people running toward her, and she turned and ran with them to exit the Mall. Eumeka ran to her car. At that point, Eumeka's son, Samuel Stewart

IV, was in the vehicle with her. Eumeka "pulled it up near the entrance to Dick's Sporting Goods, terrified for the safety of her daughters." *Id.* at 42.

[5] A legally armed bystander carrying a handgun immediately engaged Sapirman, "striking and killing him." *Id.* at 41. First responders arrived approximately eight minutes after Sapirman was killed. Eumeka learned that Kaya had been shot. O.S. informed Eumeka that she was hiding from the shooter with her friend inside the nearby movie theater. Eumeka's son, Samuel, ran into the theater and carried O.S. who had fainted out of the theater. Eumeka and Samuel later witnessed Kaya being brought out of the Mall on a stretcher having suffered severe gunshot injuries.

[6] According to the amended complaint, "no action was taken by the Defendants to safely evacuate shoppers and other invitees, including the Plaintiffs, from the time [Sapirman] entered the Mall property, walked across the parking lot carrying a large backpack, entered the Mall, walked through the food court, and entered the bathroom where he spent more than an hour preparing for the shooting." *Id.* "[N]o Simon employees or [Universal] personnel attended to the men's restroom in the food court area or checked on [Sapirman] as he lingered in a stall for more than an hour . . . ." *Id.* "[D]espite the fact that the food court area of the Mall was crowded with shoppers at the time of the shooting, at least one security guard had left the Mall through an exit near the food court just minutes before [Sapirman] exited the restroom and began firing, and an hour before the mall was scheduled to close." *Id.* at 42.

On January 30, 2024, Plaintiffs filed an Amended Complaint for Damages asserting that Simon and Universal allocated their security resources unevenly from one demographic area to the other; the premises posed an unreasonably dangerous risk to invitees because Defendants had failed to take reasonable precautions to assure the premises were safe and secure; and, prior to July 17, 2022, Defendants were on notice that the premises posed an unreasonably dangerous risk to invitees because the premises and others owned and protected by Defendants had been the sites of shootings, aggravated assaults, gang-related crimes, and/or race-based threats and intimidation. They asserted that Defendants utilized security patrols in the parking lot in order to detect suspicious individuals and activity; Defendants had in place dozens of video cameras and it was unknown which of these cameras were working on July 17, 2022; Defendants tasked employees with monitoring the Mall's video camera feeds for the presence of individuals who might pose a threat to the safety of shoppers and others; Simon's security resources were not dedicated to proactively detecting suspicious activity, firearms, and other prohibited weapons; and, prior to July 17, 2022, Simon did not update its security policies, procedures, or safeguards to reflect and/or be commensurate with the growing prevalence of threats of violence and mass shootings in our society. They further alleged that it was foreseeable to Defendants that something catastrophic and/or similar to this shooting could occur, particularly because Sapirman was seen, or should have been seen, walking through the parking lot of the Mall, into the Mall, and into a restroom near the food court while carrying a heavy, long black backpack, then remaining in that restroom for

more than an hour while he prepared to shoot innocent patrons; and it was foreseeable to Defendants that this particular perpetrator, given his age, appearance, behavior, and because of the unique backpack he was carrying, all fit the well-recognized profile of a potential mass shooter.

[8] Plaintiffs also asserted that no action was taken by the Defendants to safely evacuate shoppers and other invitees from the time Sapirman entered the Mall property, walked across the parking lot carrying a large backpack, entered the Mall, walked through the food court, and entered the bathroom where he spent more than an hour. They alleged that Universal personnel were not present in the food court area at the time of the shooting and that no employee of Defendants checked on Sapirman while he lingered in the restroom. They alleged that "[a] guard's presence in the parking lot, mall corridors, food court, and/or restroom, if noticed by the shooter, may have deterred [Sapirman] from carrying out the shooting." *Id.*

[9] Plaintiffs alleged Count I, premises liability against Simon; Count II, negligence against Simon and Universal; Count III, gross negligence against Simon and Universal; and Count IV, negligent infliction of emotional distress against Simon and Universal. With respect to Count I, Plaintiffs asserted that Simon "had a duty of reasonable care to protect [them] . . . against dangers [of] which [Simon] actually knew or should have known" and "[t]hose dangers included the fact that dangerous and criminal activity had previously occurred at the Greenwood Park Mall, including race-based threats, and that mass shootings had occurred in many malls and public spaces throughout the U.S. in the

months and years leading up to this shooting." *Id.* at 44.  As for Count II, Plaintiffs asserted that Defendants "had a duty to provide a safe shopping mall for customers and other invitees, including the Plaintiffs." *Id.* at 47.

[10] On March 18, 2024, Simon filed a Motion to Dismiss.  Simon argued that the general class of plaintiff in this case is a mall patron, the alleged harm resulted from a shooting inside the mall, and, "[a]s a matter of law, such shootings are not 'normally to be expected,' meaning they are not foreseeable, and no duty arises." *Id.* at 55.  It contended that "[t]he rule set out in *Goodwin* [*v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384 (Ind. 2016),] and *Rogers* [*v. Martin*, 63 N.E.3d 316 (Ind. 2016)], applied in *Rose* [*v. Martin's Super Markets LLC*, 120 N.E.3d 234 (Ind. Ct. App. 2019), *trans. denied*], and reiterated in *Pennington* [*v. Mem'l Hosp. of S. Bend, Inc.*, 223 N.E.3d 1086 (Ind. 2024)], leads to only one conclusion: this case should be dismissed." *Id.*  It requested that the court dismiss the amended complaint "pursuant to Trial Rule 12(B)(6)." *Id.* at 66.

[11] On March 18, 2024, Universal filed a Motion to Dismiss Plaintiffs' Amended Complaint Under Indiana Trial Rule 12(B)(6).  It alleged that Plaintiffs' allegations "bear no facts supporting the conclusion either 1) that the random or symbolic shooting here constitutes the broad type of plaintiff and the broad type of harm that are foreseeable" or "2) that either defendant knew or had reason to know of any present and specific circumstance that would cause a reasonable person to recognize the probability or likelihood of imminent harm." *Id.* at 79.

On April 17, 2024, Plaintiffs filed a Response to Defendants' Motions to Dismiss. They argued that every substantive case cited by Defendants involved a motion for summary judgment rather than a motion to dismiss. They asserted that, "[c]onsistent with Indiana's notice pleading standards as well as the standard that governs defendants' motions to dismiss, it must be assumed that defendants were aware of circumstances that placed them on notice of the likelihood of imminent harm while adjudicating their motions, and a no-duty invocation may only be brought by way of a motion for summary judgment after the completion of discovery." *Id.* at 87. They also referenced an "Imminent Harm Exception" and asserted that the Court in *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837 (Ind. 2020), "concluded that the proprietor did not owe its patron a duty because 'it did not know the fight was imminent.'" *Id.* at 94 (quoting *Cavanaugh's*, 140 N.E.3d at 838). They argued that "[t]he nature of the imminent harm exception to *Goodwin* will almost always render a motion to dismiss an improper vehicle for a no-duty motion, as it is always possible for discovery to reveal that a premises owner possessed knowledge that should have rendered it aware of a threat." *Id.*

With respect to Universal, Plaintiffs contended that "[t]he no-duty rule invoked by Universal applies to premises owners," Universal "is a security company rather than a premises owner," and "[a]s such, [Universal's] no-duty invocation constitutes a 'categorical error,' and [Universal's] conduct is, instead governed by the duties that it assumed by way of its contract with Simon." *Id.* at 87.

On May 14, 2024, the trial court entered an order denying the motions to dismiss. Upon Defendants' request, the trial court entered an order certifying its May 14, 2024 order for interlocutory appeal, and this Court accepted jurisdiction.

**Discussion**

Simon argues that the Indiana Supreme Court set forth the applicable test for foreseeability in the context of whether a duty is owed to invitees to prevent third-party criminal attacks in *Goodwin* and *Rogers*. It argues that the *Goodwin* Court instructed trial courts not to address "the specific facts of the occurrence." Appellant Simon's Brief at 8 (citing *Goodwin*, 62 N.E.3d at 389).

Universal raises similar arguments to Simon and asserts that it did not have a duty to prevent Sapirman's shooting because it was not foreseeable as a matter of law. It argues that "[t]here is no 'imminent harm exception' to the *Goodwin-Rogers* foreseeability analysis, so discovery is not necessary before the analysis can be applied." Appellant Universal's Brief at 18. It argues that the Indiana Supreme Court's decision in *Pennington* underscores that there is no imminent harm exception. It "acknowledges that its research to date has not located a reported appellate decision in which the *Goodwin-Rogers* foreseeability analysis was applied at the motion to dismiss stage, but this does not mean that it cannot or should not be done." *Id.* at 26.

Plaintiffs argue that *Goodwin* does "not sponsor a noxious rule of law that would render Indiana the only jurisdiction in the United States to permit a

proprietor to do nothing notwithstanding" knowledge of an imminent threat to patron safety. Appellees' Brief at 17. They point to *Hamilton v. Steak 'n Shake Operations, Inc.*, 92 N.E.3d 1166 (Ind. Ct. App. 2018), *trans. denied*, *Certa v. Steak 'n Shake Operations Inc.*, 102 N.E.3d 336 (Ind. Ct. App. 2018), *trans. denied*, *Buddy & Pals III, Inc. v. Falaschetti*, 118 N.E.3d 38 (Ind. Ct. App. 2019), *trans. denied*, *BoJak's Bar & Grille v. Henry*, 170 N.E.3d 264 (Ind. Ct. App. 2021), *Singh v. Singh*, 155 N.E.3d 1197 (Ind. Ct. App. 2020), *Doe v. Delta Tau Delta*, 2018 WL 3375016 (S.D. Ind. 2018), and *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837 (Ind. 2019), and assert that these cases are instructive. They contend that "the fact that every jurisdiction in America imposes a duty upon proprietors to protect patrons from known threats buttresses *Cavan*[*augh's*], *Rogers*, *Hamilton*, *Certa*, *Buddy & Pals, III, Inc.*, *BoJak's*, *Singh*, and *Delta Tau Delta's* determination that a duty is imposed when a proprietor knows that an invitee is confronted with an imminent threat to the invitee's safety." *Id.* at 27.

[18] They assert that Ind. Trial Rule 8(a)(1) "only requires a complaint to include 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and the heightened pleading requirements of Trial Rule 9(B) do not require a plaintiff to plead that a premises liability defendant had knowledge of imminent harm." *Id.* at 31. They contend that, until it is determined whether Defendants observed Sapirman in the hour he was in the Mall with an assault rifle prior to the shooting and if there was something about Sapirman's actions that would cause Defendants to know or have reason to know of any present and specific circumstances that would cause a reasonable person to recognize

the probability or likelihood of imminent harm, the adjudication of a dispositive motion is premature. With respect to Universal, Plaintiffs assert that they "expressly bring their premises liability claims against <u>only</u> Simon." *Id.* at 38 (citing Appellants' Appendix Volume II at 43). They argue that "Universal is subject to potential liability outside of the premises law context." *Id.*

[19] We begin by observing that a motion to dismiss under Ind. Trial Rule 12(B)(6) tests the legal sufficiency of the complaint. *Price v. Ind. Dep't of Child Servs.*, 80 N.E.3d 170, 173 (Ind. 2017). We accept as true the facts alleged in the complaint. *Id.*; *see also Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 134 (Ind. 2006) ("A motion to dismiss under Rule 12(B)(6) tests the legal sufficiency of a complaint: that is, whether the allegations in the complaint establish any set of circumstances under which a plaintiff would be entitled to relief."). Although a plaintiff need not set out in precise detail the facts upon which the claim is based, he must still plead the operative facts necessary to set forth an actionable claim. *Trail*, 845 N.E.2d at 135. When ruling on a motion to dismiss, the court must view the pleadings in the light most favorable to the nonmoving party with every reasonable inference construed in the non-movant's favor. *Thornton v. State*, 43 N.E.3d 585, 587 (Ind. 2015). We review a trial court's grant or denial of a Trial Rule 12(B)(6) motion *de novo. Id.* Dismissals under Trial Rule 12(B)(6) are rarely appropriate. *King v. S.B.*, 837 N.E.2d 965, 966 (Ind. 2005). "Indeed, dismissal is appropriate only when 'it appears to a certainty on the face of the complaint that the complaining party is not entitled to any relief.'" *WEOC, Inc. v. Niebauer*, 226 N.E.3d 771, 774 (Ind.

2024) (quoting *State v. Am. Fam. Voices, Inc.*, 898 N.E.2d 293, 296 (Ind. 2008), *reh'g denied*).

[20] Ind. Trial Rule 8(A) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Ind. Trial Rule 8(E) provides that "[e]ach averment of a pleading shall be simple, concise, and direct." Ind. Trial Rule 8(F) provides that "[a]ll pleadings shall be so construed as to do substantial justice, lead to disposition on the merits, and avoid litigation of procedural points." The Indiana Supreme Court has held that Indiana is a notice-pleading state and that, "[i]n practice, this liberal standard merely requires that a 'complaint . . . put the defendant on notice concerning why it is potentially liable and what it stands to lose.'" *KS&E Sports v. Runnels*, 72 N.E.3d 892, 901 (Ind. 2017) (quoting *Noblesville Redev. Comm'n. v. Noblesville Assocs. Ltd. P'ship*, 674 N.E.2d 558, 564 (Ind. 1996)). "To satisfy this standard, the plaintiff need not 'state all the elements of a cause of action.'" *NFI Interactive Logistics LLC v. Bruski*, 239 N.E.3d 63, 69 (Ind. Ct. App. 2024) (quoting *State v. Rankin*, 260 Ind. 228, 294 N.E.2d 604, 606 (1973)), *trans. denied*. Rather, the plaintiff "need only plead the operative facts involved in the litigation." *Id.* (quoting *Rankin*, 260 Ind. 228, 294 N.E.2d at 606).

[21] "Furthermore, although it 'may be highly desirable' for the plaintiff to include a 'statement of the [plaintiff's] theory' of liability in the complaint, the plaintiff 'is not required' to plead a specific theory of liability." *Id.* (quoting *Rankin*, 260 Ind. 228, 294 N.E.2d at 606). "Moreover, to the extent a defendant would benefit from explication of the theory of the case, '[o]ther means less drastic

than dismissal . . . can be used to clarify the theory and basis for the cause of action,' such as (1) a 'motion for a more definite statement under [Trial Rule] 12(E)' (2) 'our very broad discovery rules,' and (3) 'the pre-trial conference [contemplated] under [Trial Rule] 16(A)(1),' which facilitates the simplification of issues brought to trial." *Id.* (quoting *Rankin*, 260 Ind. 228, 294 N.E.2d at 606, and citing *Trs. of Ind. Univ. v. Spiegel*, 186 N.E.3d 1151, 1157 (Ind. Ct. App. 2022) (noting that we generally view a Trial Rule 12(B)(6) motion "with disfavor" and instead encourage the use of discovery tools to identify a theory of the case, noting that "such motions undermine the policy of deciding causes of action on their merits") (quoting *Tony v. Elkhart Cnty.*, 851 N.E.2d 1032, 1035 (Ind. Ct. App. 2006)), *trans. denied*).

[22]  We next turn to the caselaw addressing landowners' liability, all of which involved proceedings at the summary judgment phase. In *Goodwin*, patrons injured after a shooting in a neighborhood bar sued the bar for negligence. 62 N.E.3d at 385. The trial court granted summary judgment in the bar's favor concluding it owed no duty to the patrons because the shooting was not foreseeable as a matter of law. *Id.* On appeal, the Indiana Supreme Court held:

> In sum, because foreseeability is—in this particular negligence action—a component of duty, and because whether a duty exists is a question of law for the court to decide, the court must of necessity determine whether the criminal act at issue here was foreseeable. This is not a "redetermination" of the duty a landowner owes its invitees. Rather, the focus is on the point and manner in which we evaluate whether foreseeability does or does not exist. *See* [*Paragon Family Restaurant v. Bartolini*, 799

N.E.2d 1048, 1053 (Ind. 2003)]. And that point initially rests with the trial court as gatekeeper.

*Id.* at 389. The Court held:

Today, upon further reflection, we are of the view that *Goldsberry* [*v. Grubbs*, 672 N.E.2d 475 (Ind. Ct. App. 1996), *trans. denied*,] provides the more accurate framework for assessing foreseeability in the duty context. . . . In so doing we join a number of jurisdictions that also distinguish between the analytical framework used to determine foreseeability in the context of duty and that used to determine foreseeability in the context of proximate cause. The jurisdictions vary somewhat in expounding on the difference between the two. However, addressing the distinction, the Supreme Court of Appeals of West Virginia captures the underlying rationale as follows:

[A] court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" . . . [in] more focused, fact-specific settings. . . .

*Strahin v. Cleavenger,* 216 W.Va. 175, 603 S.E.2d 197, 207 (2004) (alterations and emphasis in original (quotation omitted)). This rationale is consistent with the observation in *Goldsberry* that "the foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence, while the foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." 672 N.E.2d at 479.

But because almost any outcome is possible and can be foreseen, the mere fact that a particular outcome is "sufficiently likely" is not enough to give rise to a duty. Instead, for purposes of determining whether an act is foreseeable in the context of duty we assess "whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." *Satterfield* [*v. Breeding Insulation Co.,* 266 S.W.3d 347, 367 (Tenn. 2008)].

*Id.* at 391-392 (footnote omitted). The Court explained that "foreseeability as a component of duty involves a lesser inquiry which 'requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.'" *Id.* at 393 (quoting *Goldsberry*, 672 N.E.2d at 479). It held:

The broad type of plaintiff here is a patron of a bar and the harm is the probability or likelihood of a criminal attack, namely: a shooting inside a bar. But even engaging in a "lesser inquiry" we conclude that although bars can often set the stage for rowdy behavior, we do not believe that bar owners routinely contemplate that one bar patron might suddenly shoot another. To be sure, we doubt there exists a neighborhood anywhere in this State which is entirely crime-free. Thus, in the broadest sense, all crimes anywhere are "foreseeable." But to impose a blanket duty on proprietors to afford protection to their patrons would make proprietors insurers of their patrons' safety which is contrary to the public policy of this state. *See Delta Tau Delta*[*, Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968, 971 (Ind. 1999)]. Further such a blanket duty would abandon the notion of liability based on negligence and enter the realm of strict liability in tort which "assumes no negligence of the actor, but chooses to impose liability anyway." *Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 276 (Ind. 2003). We decline to impose such liability here.

In sum we hold that a shooting inside a neighborhood bar is not foreseeable as a matter of law.

*Id.* at 393-394 (footnote omitted).

[23] In *Rogers*, Angela Martin and Brian Brothers co-hosted a house party. 63 N.E.3d at 317. As it wound down, Brothers and two guests, Jerry Chambers and Paul Michalik, engaged in a fistfight. *Id.* Afterwards, Martin found Chambers bleeding from his face and Michalik lying motionless on her basement floor. *Id.* at 318. Michalik died shortly thereafter. *Id.* Chambers's bankruptcy trustee and Michalik's estate sued Martin, claiming, in part, that she negligently caused Michalik's injuries. *Id.* Martin filed a motion for summary judgment, which the trial court granted. *Id.*

[24] The Indiana Supreme Court held:

> Under Indiana premises liability law, the duty a landowner owes to an invitee is well established: a landowner must exercise reasonable care for the invitee's protection while the invitee is on the premises. Because this general duty has been articulated, the Court need not judicially determine the existence of a separate duty today. Rather, we look to foreseeability as the critical inquiry in deciding whether the landowner-invitee "duty to protect" extends to a particular scenario.

*Id.* at 320. "[W]hether a duty exists is a question of law for the court to decide. *Id.* at 321. "But a judicial determination of the existence of a duty is unnecessary where the element of duty has 'already been declared or otherwise

articulated.'" *Id.* (quoting *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003)).

[25] The Court held that "[w]here a premises liability claim is based on activities on the land, foreseeability is the critical inquiry in determining whether the landowner's duty of reasonable care extends to the particular circumstances at issue." *Id.* at 323. It held:

> When foreseeability is part of the duty analysis, as in landowner-invitee cases, it is evaluated in a different manner than foreseeability in the context of proximate cause. Specifically, in the duty arena, foreseeability is a general threshold determination that involves an evaluation of (1) the broad type of plaintiff and (2) the broad type of harm. In other words, this foreseeability analysis should focus on the general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected—without addressing the specific facts of the occurrence. *Goodwin*[, 62 N.E.3d at 388-389] (evaluating why this is the appropriate framework in determining foreseeability in the duty context). We believe this analysis comports with the idea that "the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." *Gariup Constr. Co., Inc. v. Foster*, 519 N.E.2d 1224, 1227 (Ind. 1988) (quoting *Prosser & Keeton on Torts* § 53, at 357-59 (5th ed. 1984)).

*Id.* at 325. In applying the test, the Court held:

> We have repeatedly stated that a landowner has a duty to take reasonable precautions to protect invitees from foreseeable criminal attacks. *E.g.,* [*Kroger Co. v. Plonski*, 930 N.E.2d 1, 7 (Ind. 2010)]. And in this case, we assume, without deciding, that Brothers's conduct in engaging in a fistfight with Chambers and

Michalik constituted a criminal act. As stated above, whether this duty applies to Martin's conduct, as a matter of law, requires us to evaluate the broad type of plaintiff and harm involved, without considering the specific facts of the case. In other words, the inquiry is not whether Martin could have foreseen that Brothers would get into a brawl with Chambers and Michalik. Rather, we look at whether a duty should be imposed on Martin, as a homeowner, to take precautions to prevent a co-host from fighting with and injuring a house-party guest. Although house parties can often set the stage for raucous behavior, we do not believe that hosts of parties routinely physically fight guests whom they have invited. Ultimately, it is not reasonably foreseeable for a homeowner to expect this general harm to befall a house-party guest; rather, to require a homeowner to take precautions to avoid this unpredictable situation would essentially make the homeowner an insurer for all social guests' safety. Accordingly, Martin had no duty to take reasonable precautions to protect Michalik from Brothers's conduct.

*Id.* at 326.

[26] With respect to Martin's duty to protect Michalik after she discovered him, the Court stated:

Martin did, however, have a duty to protect Michalik after she found him lying unconscious on her basement floor. Homeowners should reasonably expect that a house-party guest who is injured on the premises could suffer from an exacerbation of those injuries. Thus, we conclude that Martin owed a duty to her social guest to protect him from the exacerbation of an injury occurring in her home. The undisputed evidence shows that Martin went down to her basement and saw Michalik listless on her floor. Michalik died shortly after. Of course, this does not necessarily mean that Martin was negligent—questions of breach and proximate cause remain for the fact-finder. In other words,

we do not decide whether Martin's failure to call the police, dial 911, or take any other affirmative action breached this duty. Nor do we determine whether Michalik's death was a natural and probable cause of Martin's conduct. We do believe, however, that reasonable persons would recognize a duty here and agree to its existence. *Gariup Constr. Co.*, 519 N.E.2d at 1227.

*Id.* at 327.

[27] In the subsequent years, this Court applied *Goodwin* and *Rogers*. *See Certa*, 102 N.E.3d at 337-342 (addressing a claim that a restaurant was negligent and a trial court's order that granted summary judgment for the restaurant; discussing *Goodwin* and *Rogers*; observing that the *Goodwin* Court "acknowledged that bar owners do not 'routinely contemplate that one bar patron might *suddenly* shoot another,'" (quoting *Goodwin*, 62 N.E.3d at 394 (emphasis added)), and "[u]se of the word 'suddenly' indicates that this was an unexpected occurrence relative to the landowner/bar owner"; observing that the *Rogers* Court "called the fight an 'unpredictable situation' and stated that hosts of parties do not 'routinely physically fight guests whom they have invited,'" (quoting *Rogers*, 63 N.E.3d at 326); holding that, "[t]hus, what the landowner knew or had reason to know is a pivotal consideration in determining foreseeability"; defining that "[t]he broad type of plaintiff is a restaurant patron, and the broad type of harm is injury caused by a third party"; stating that, "[i]n determining the foreseeability, we are mindful that [the restaurant] did not have to know the precise harm that its customer would suffer, only that there was some probability or likelihood of harm that was serious enough to induce a reasonable person to take precautions

to avoid it"; observing that the restaurant "knew that a heated encounter that began outside the restaurant between two groups of intoxicated people spilled into the restaurant"; holding that, "[g]iven these circumstances, we conclude that [the restaurant's] knowledge of the events on its premises in this case gave rise to a duty to take reasonable steps to provide for [the plaintiff's] safety as a patron of its establishment"; and concluding that the trial court erred in granting summary judgment in favor of the restaurant); *Hamilton*, 92 N.E.3d at 1173-1174 (observing that the *Goodwin* Court concluded that bar owners do not "routinely contemplate that one bar patron might *suddenly* shoot another," (quoting *Goodwin*, 62 N.E.3d at 394 (emphasis supplied in *Hamilton*)); defining the broad type of plaintiff as a restaurant patron who had been subjected to escalating threats and taunts and the broad type of harm as injury resulting after the encounter culminated in physical violence; holding that the restaurant did not have to know the precise harm that would befall its customer, only that there was some probability or likelihood that one of its patrons could be harmed and that the potential harm was serious enough that a reasonable person would have been induced to take precautions to avoid it; concluding that the restaurant had a duty as a proprietor to take reasonable steps to provide for patron safety once the raucous behavior came to its attention; and reversing the trial court's entry of summary judgment in favor of the restaurant); *BoJak's Bar & Grille*, 170 N.E.3d at 267 (observing that the incident was not an unforeseeable sudden act that occurred without warning; stating that the designated evidence established that BoJak's staff knew of prior tension between the two groups and had specifically been warned of an altercation that

had occurred between the two groups the prior week, and BoJak's security felt the two groups required extra attention, checking on them more than ten times and keeping a "constant watchful eye"; and holding that the facts were more akin to those in *Hamilton* than those in *Goodwin*, BoJak's owed a duty to plaintiff, and the trial court properly denied BoJak's motion for summary judgment); *Buddy & Pals III, Inc.*, 118 N.E.3d at 40-43 (addressing a situation in which a patron who was ejected via the back door of a sports bar for fighting later punched another patron outside the front entrance; finding that, unlike in *Goodwin* which involved one patron suddenly shooting other patrons inside the bar, a pugnacious patron who had been ejected for fighting punched another patron exiting the bar by the other door and this was the type of "rowdy behavior . . . that bar owners routinely contemplate," *Goodwin*, 62 N.E.3d at 394; and holding that the fact that the bar had several bouncers on duty inside the bar and an off-duty officer patrolling the parking lot underscored the foreseeability of these types of occurrences and that the case was more akin to the *Steak 'n Shake* cases).

[28] In 2020, the Indiana Supreme Court addressed a claim of negligence against Cavanaugh's Sports Bar & Eatery after Eric Porterfield sustained injuries at the 3 a.m. closing time during a fight with some other departing customers. 140 N.E.3d at 838. Porterfield sued the bar for negligence, alleging that Cavanaugh's breached its duty to protect him when the bar was "located in an area of criminal activity," was "known, or should have been known by [Cavanaugh's], to be frequented by persons with a propensity to engage in

criminal conduct," and had "experienced criminal activity for years prior to the attack on Porterfield." *Id.* at 838-839. Cavanaugh's moved for summary judgment, maintaining that it owed no duty to Porterfield. *Id.* at 839. The trial court denied summary judgment. *Id.*

[29] On interlocutory appeal, the Court of Appeals affirmed, holding that "parking lot fistfights at closing time are generally within the type of 'rowdy behavior' that bar owners should contemplate." *Id.* (quoting *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 123 N.E.3d 170, 174 (Ind. Ct. App. 2019) (quoting *Goodwin*, 62 N.E.3d at 393-394), *vacated*).

[30] On transfer, the Indiana Supreme Court observed that "without notice of present and specific circumstances that would cause a reasonable person to recognize the risk of an imminent criminal act, our Court of Appeals has consistently held since *Goodwin* and *Rogers*—until now—that landowners cannot foresee these sudden attacks." *Id.* at 842-843. The Court discussed *Goodwin* and *Rogers* and stated:

> When evaluating the broad class of plaintiff and broad type of harm in these cases, we acknowledged a key factor is whether the landowners knew or had reason to know about any present and specific circumstances that would cause a reasonable person to recognize the probability or likelihood of imminent harm. . . . If landowners had reason to know of any imminent harm, that harm was, as a matter of law, foreseeable in the duty context.

*Id.* at 840-841.

The Court held that Cavanaugh's "had no reason to foresee a bar patron blinding another during a sudden parking lot fight." *Id.* at 843. It observed that, "[b]y pointing to police runs made to the bar during the year before the quarrel, Porterfield improperly substitutes evidence of the bar's past raucousness for contemporaneous knowledge of imminent harm." *Id.* at 844. The Court held that "this type of historical evidence, while 'appropriate in evaluating foreseeability in the context of proximate cause,' should play no role when we evaluate 'foreseeability as a component of duty.'" *Id.* (quoting *Goodwin*, 62 N.E.3d at 393). It held that "[a] landowner's present knowledge, however, more conclusively elevates the knowledge of risk to some probability or likelihood of harm, allowing courts to continue to find a duty when reasonable persons would recognize it and agree that it exists." *Id.* (citations and quotation marks omitted). The Court concluded:

> Landowners must "take reasonable precautions to protect invitees from foreseeable criminal attacks." *Rogers*, 63 N.E.3d at 326. To determine whether this duty, as a matter of law, extends to the criminal act at issue in a particular scenario, the critical inquiry is to determine whether the attack was foreseeable, considering the broad type of plaintiff, the broad type of harm, and whether the landowner had reason to expect any imminent harm. Because we hold that the criminal attack at issue here was unforeseeable, the duty of Cavanaugh's to protect Porterfield did not extend to this particular scenario.

*Id.*[2]

[32]   In 2024, the Indiana Supreme Court again addressed a landowner's duty of care but in the context of a condition of the premises resulting an injury. In *Pennington*, Dr. Jennifer Pennington swam several laps in a pool and, after transitioning from freestyle to backstroke, her head collided with the corner of a wall by the entry steps, causing her injury. 223 N.E.3d at 1092. Dr. Pennington and her husband subsequently filed suit against multiple parties, and the trial court entered an order on motions for summary judgment. *Id.* at 1091-1092.

[33]   In discussing the test for activities on a landowner's premises unrelated to the premises' condition, the Court held:

> In the companion cases of *Rogers* and *Goodwin*, we explained that, "in the duty arena," foreseeability "involves an evaluation of (1) the broad type of plaintiff and (2) the broad type of harm." [*Rogers*, 63 N.E.3d] at 325; *see Goodwin*, 62 N.E.3d at 394 (restating the same). We consider the "general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected—**without addressing the**

---

[2] Justice Goff dissented with a separate opinion in which Justice David joined. 140 N.E.3d at 844-847 (Goff, J., dissenting). Justice Goff stated that the majority added new requirements to the foreseeability inquiry, elevating the standard to impose a duty, and focused on the particular facts of the case, contrary to the standard provided by precedent. *Id.* at 844-845. He wrote that "[c]ontemporaneous evidence—such as escalating tensions—may inform the . . . determination of foreseeability, but nothing about this determination requires that evidence." *Id.* at 845 (footnote omitted). He indicated that he would resolve the case differently "—focusing on the general, common-sense nature of this foreseeability inquiry—and find that Cavanaugh's owed Porterfield a duty." *Id.* Specifically, he wrote that he would find that the broad type of plaintiff was a bar patron, the broad type of harm was injury resulting from a fistfight at the bar's early morning closing time, a closing-time fistfight was foreseeable as a matter of law, and Cavanaugh's owed a duty to protect Porterfield from this foreseeable fight. *Id.* at 847.

**specific facts of the occurrence.**" *Rogers*, 63 N.E.3d at 325 (citing *Goodwin*, 62 N.E.3d at 388-89) (emphasis added). In *Goodwin*, for example, the plaintiffs alleged that the defendant bar should have protected them against being shot by a patron. 62 N.E.3d at 385-86. We asked the general question whether "bar owners routinely contemplate that one bar patron might suddenly shoot another." *Id.* at 393-94.

A critical difference thus exists between the foreseeability tests for conditions and activities. The Restatement test that we use for conditions looks at whether the danger posed by the specific condition involved was foreseeable. Whereas, the *Rogers/Goodwin* test that we use for activities looks at whether it was foreseeable that a general class of persons to which the plaintiff belonged might suffer the general type of harm involved. This distinction makes sense in that a landowner can know the precise physical condition of their premises, but only generally foresee what conduct or behavior will occur.

*Id.* at 1097-1098. It found that the substance of the claim was that a condition of the premises caused an injury and applied the test for the foreseeability of dangerous conditions. *Id.* at 1098. Accordingly, the *Pennington* Court did not specifically apply the test related to activities and did not mention *Cavanaugh's*. We cannot say that *Pennington* warrants reversal.

[34] The foregoing review of the law of duty as it has evolved in Indiana reveals that it can be quite nuanced when we are applying our well-settled standard of review on summary judgment. However, the procedural posture of this case makes our decision here straightforward. Mindful that this case arises following the denial of motions to dismiss, that Indiana is a notice-pleading state with a liberal standard, and that we view the pleadings in the light most

favorable to the nonmoving party with every reasonable inference construed in the non-movant's favor, we cannot say that the trial court erred in denying the Defendants' motions to dismiss.[3]

[35] With respect to Universal's arguments relating to whether Plaintiffs brought claims against it only based upon premises liability, Count I of the Plaintiffs' amended complaint was titled "PREMISES LIABILITY AGAINST SIMON PROPERTIES." Appellants' Appendix Volume II at 43. In Count II, "NEGLIGENCE AGAINST ALL DEFENDANTS," Plaintiffs alleged that Simon hired Universal to provide a reasonably secure environment for its customers and invitees and Universal had a duty to provide a safe shopping mall. *Id.* at 47. Count III alleged "GROSS NEGLIGENCE AGAINST ALL

---

[3] To the extent Simon and Universal cite *Rose*, we find that case distinguishable. In *Rose*, a man began shooting inside a store. 120 N.E.3d at 236. The trial court granted the store's motion for summary judgment on a negligence claim. *Id.* This Court discussed *Certa* and *Hamilton* as cases applying the *Goodwin* framework in situations where the landowner was aware of a threat of injury and then observed that the shooter did nothing during the time he was in the store before he drew his gun to draw attention to himself or betray his intentions, he interacted normally with store employees, and he aroused no suspicion based upon what he was wearing or what he was doing. *Id.* at 242. Significantly, *Rose* involved a motion for summary judgment and not a motion to dismiss. Moreover, unlike in *Rose*, where there were no present and specific circumstances that would cause a reasonable person to recognize the risk of an imminent criminal act, the amended complaint here alleged that Sapirman walked from his nearby residence on the day of the shooting through the Mall parking lot, past multiple security patrols and video cameras, while wearing or carrying "a long, black backpack consistent with those used to tote rifles and other assault weapons," remained in a restroom for over an hour where he donned an ammunition vest and assembled several weapons, and exited the restroom carrying a rifle in his hands. Appellants' Appendix Volume II at 40.

As for Universal's citation of *Doe v. K.M.W.*, 230 N.E.3d 306 (Ind. Ct. App. 2024), we observe that in *K.M.W.*, we affirmed the trial court's grant of summary judgment on a premises liability claim. 230 N.E.3d at 322. We observed that "when there was no 'notice of present and specific circumstances that would cause a reasonable person to recognize the risk of an imminent criminal act, [this Court] has consistently held since *Goodwin* and *Rogers* . . . that landowners cannot foresee these sudden attacks.'" *Id.* at 319 (quoting *Cavanaugh's*, 140 N.E.3d at 842-843). In light of the allegations alleged in the Plaintiffs' complaint, we find *K.M.W.* distinguishable. Further, unlike *K.M.W.*, the present case is before this Court after the denial of a motion to dismiss.

DEFENDANTS." *Id.* at 48. Thus, we reject Universal's narrow characterization of Plaintiffs' claims against it and conclude that, at this stage of the proceedings and without the benefit of completed discovery, the trial court did not err in denying Universal's motion to dismiss.

[36] For the foregoing reasons, we affirm the trial court's order.

[37] Affirmed.

Altice, C.J., and Tavitas, J., concur.

ATTORNEYS FOR APPELLANT SIMON PROPERTY GROUP, INC.

Wayne C. Turner
Michael R. Limrick
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT UNIVERSAL PROTECTION SERVICE, LLC D/B/A ALLIED UNIVERSAL SECURITY SERVICES, LLC

Melissa A. Murphy-Petros
Wilson Elser Moskowitz Edelman & Dicker LLP
Chicago, Illinois

Justin G. Hazlett
Joseph V. Macha
Wilson Elser Moskowitz Edelman & Dicker LLP
Carmel, Indiana

ATTORNEYS FOR APPELLEES

Gabriel A. Hawkins
Gregory L. Laker
Andrea R. Simmons
Cohen & Malad, LLP
Indianapolis, Indiana